1808

Davis
vs
Walsh

---

## DAVIS et ux. vs. WALSH.

APPEAL from a decree of the Court of Chancery, *dismissing* the bill of complaint. The bill stated, that *Davis* being seized of a valuable real property, and also possessed of a considerable personal estate, consisting, among other things, of certain chattels real, and being also indebted to divers citizens of this and of the *United States*, beyond what he was able to pay without a greater indulgence than his creditors were disposed to grant him, was compelled, sometime in the summer of the year 1787, to apply to the chancellor for the benefit of the act of assembly respecting insolvent debtors; that in consequence

DECEMBER.

W D becoming an insolvent debtor, his real estate was sold by his trustee, and purchased by C D, to whom a deed was executed. C D, in making the purchase, acted professedly as a friend to W D, so far that if he could procure the purchase money within a certain time, he was to have the benefit of the purchase; but as he could not raise the purchase money, it became necessary to sell a part of the

estate to reimburse C D, which part W D and M his wife, were desirous to preserve to themselves, and were anxious to procure a friend to become the purchaser for and on behalf of M, the wife, and as a trustee for her; which intention, previous to the sale, was made known to R W, who approved of it, and it was agreed that J S, should be the nominal purchaser, and R W was to be his surety for the purchase money. J S became the purchaser, and it was known and understood, at the time, that he purchased for M the wife of W D. R W became surety for J S, and W D has always been in possession of the premises. W D, having part of the purchase money applied to R W, to obtain a bond of conveyance from C D to M, the wife of W D, for the property, when he was informed by R W that he had got a bond to himself, as J S had given it all up to him, and that W D had nothing to do with it. J S had been induced, in order to secure R W, to direct C D to give a bond of conveyance to R W, who assured J S that no advantage should be taken of W D, and that when he paid the purchase money, a deed should be executed to his wife M. The premises were conveyed by C D to R W, who brought an action of ejectment against W D. The amount of principal and interest, of the purchase money, was tendered by W D to R W, and a deed demanded, which he refused to execute. W D, and M his wife, filed their bill against R W, to be quieted in their possession of the premises, and to compel a conveyance from him to M, the wife.—*Decreed*, that R W convey the land in question to W D, and M, his wife, in fee simple, and that an account be stated, &c, and the balance due be paid at the time R W shall convey the land,

1808

Davis
vs
Walsh

thereof *Stephen Wilson* and *Robert Lemmon* were appointed trustees on behalf of the creditors of *Davis*, and that he executed to them, on the 10th of October 1788, a deed of all his real and personal property. That the trustees proceeded to sell, and did sell a part of the property to *Cumberland Dugan*, for the sum of £1310 current money, and on the 6th of November 1792, the trustees executed to *Dugan* a deed for the property so to him sold. That *Dugan*, in making the purchase, acted professedly as the friend of *Davis*, so far, that if he *Davis* could procure the purchase money within a certain time, he was to have the benefit of the purchase; but as he was not able so to do, it became necessary to sell the property, or a part thereof, to raise the purchase money, and to indemnify *Dugan*; and that *Dugan* being about to sell the property; and among the rest the following five lots, distinguished on a plot of *Baltimore* town by the numbers 950, 951, 952, 953 and 954, which lay connected and adjoining each other, on which *Davis* had a house, in which he resided with his family, and also a garden adjoining the house, which *Davis* and his wife were particularly desirous to preserve for themselves, but thinking themselves not able to purchase the whole of the lots, they were anxious that the lots should not be sold together, but subdivided into three or more subdivisions, each to be sold separately; and one of the subdivisions to include the house and garden; and in that case it was agreed that a friend should become the purchaser of the subdivision, including the house and garden, for and on behalf of *Mary*, the wife of *Davis*, and as a trustee for her, and that upon the purchase money being paid, the subdivision, so to be purchased, should be conveyed to her; and the better to effect this design, *Davis* and wife conversed with *Walsh*, the defendant, who professed himself a very warm friend to *Davis* and wife, and requested him to endeavour to prevail on *Dugan* to sell the lots in subdivisions, to enable *Mary*, the wife of *Davis*, by the intervention of a friend, to become the purchaser, fully disclosing to *Walsh* the intention of *Davis* and wife, that the wife should thus become the purchaser of that subdivision which should include the house and garden. *Walsh* perfectly approved *Davis* and wife's design, and promised to give his assistance for its completion, but declared, that in preference to applying to *Dugan* himself,

he would apply to major *Thomas Yates,* the auctioneer, and solicit him to procure *Dugan* thus to subdivide the property, and as an encouragement for *Dugan* so to do, he would let *Yates* know that in such case he, *Walsh,* would purchase one of the subdivisions, consisting of meadows. That *Walsh* accordingly applied to *Yates* to procure a subdivision of the lots, informing *Yates* that it was intended the subdivision, in which the house and garden were included, should be bought in, in trust for the wife of *Davis;* and *Yates,* in consequence, prevailed on *Dugan* to subdivide the lots into three subdivisions, in such manner that one of them, containing nearly one acre of ground, should include the house and garden. That *Davis* and wife, agreed with *Joseph Stockton,* who married the sister of the wife of *Davis,* to be the nominal purchaser of the house and garden for the wife of *Davis,* and to attend the sale and bid off the said subdivision for her, with which *Walsh* was fully acquainted. That *Davis,* the morning before the sale, applied to *Walsh* to be the security of *Stockton* for complying with the terms of payment, provided *Stockton* purchased the house and garden on behalf of the wife of *Davis,* which *Walsh* agreed to do. That both *Davis* and wife, as well as *Walsh* and *Stockton,* attended the sale; that *Stockton* bid for the subdivision, including the house and garden, and it was struck off to him for the sum of £135, that being the highest bid for the same; and that *Walsh* became the purchaser of the other two subdivisions, giving for the one £90, and for the other £83. That *Walsh, Dugan,* and others, well knew that *Stockton* bid for the wife of *Davis;* that this was repeatedly mentioned, and that publicly, during the auction, and while he was bidding for the property. That by the terms of the sale, one-third of the purchase money was to be paid in three months from the day of sale, one-third in six months, and the other third in nine months, and that the sale was made on the 15th of June 1792, before which time *Wilson* and *Lemmon* had made their sale to *Dugan,* although they did not execute the deed to *Dugan* until some months after. That *Stockton* executed and delivered to *Dugan* a bond, with *Walsh* his surety, for payment of the purchase money for the subdivision purchased by *Stockton* for the wife of *Davis;* the money to pay for which was to be furnished and provided by *Davis;* and that *Walsh* executed and delivered to *Dugan* a

bond, with *Stockton* his surety, for the purchase money of the other two subdivisions. That *Davis* and wife *have had the constant actual possession of the subdivision* so bid off by *Stockton*, ever since the said purchase. That the day of the sale, *Davis* was at the house of *Stockton*, when *Dugan* was there with bonds to be executed for the purchase money, and *Davis* observed that they ought to state the money was for the house and garden, but *Dugan* replied, it was immaterial, for that he would at any time give a bond for the conveyance thereof. That sometime after the sale, *Davis* called on *Walsh*, and told him he thought it time for *Dugan* to give his bond to convey the house and garden; for that he, *Davis*, had procured a great part of the sum first to be paid, and that he *Davis* wished to have a bond for the conveyance before he made the payment; whereupon, after a short pause, *Walsh* replied, to the amazement of *Davis*, that he, *Walsh*, had got a bond for the conveyance, and that *Davis* had nothing to do with it. *Davis* then asked *Walsh* what he meant by having a bond of conveyance, as he, *Walsh*, was only the surety for *Stockton* who purchased it in trust for the wife of *Davis*? *Walsh* replied, he meant that *Stockton* had given it all up to him. *Davis* then told *Walsh* that when the first payment became due he expected to make the payment, and that he did not want *Walsh* to pay for him, to which *Walsh* answered with warmth that *Davis* had nothing to do with it. That *Stockton* (as *Davis* and wife are informed and believe,) being about to leave this state and go to *Pennsylvania*, where he now resides, was induced, in order to secure *Walsh*, to direct that *Dugan* should give the bond of conveyance to *Walsh*, *Walsh* at the same time assuring *Stockton* that no advantage should be taken thereof, but that whenever *Davis* paid the purchase money, the wife of *Davis* should have a deed executed to her for the same. That some months after the sale, *Davis* went to *Dugan*, and offered to pay him $200, which he had then ready to pay him, and to give *Dugan* security for the residue, provided he would give up the bonds which *Stockton* had executed, with *Walsh* as his surety, and offered to make payment of the residue in sixty days, but *Dugan* declared he could do nothing without consulting *Walsh*, and that he, *Dugan*, must make the conveyance to whomsoever *Stockton* directed, saying that he did not know *Davis* in the transaction, altho' at the same

time *Dugan* acknowledged that he knew *Stockton* purchased the property for the wife of *Davis;* and that *Stockton* had so mentioned in his, *Dugan's* presence, to *Walsh,* and also that *Stockton* made *Walsh* promise that she should have it when *Davis* paid the money for which it was purchased. That *Davis* was always willing and desirous to have paid the purchase money according to the contract, and several times applied to *Dugan* on the subject, and also to *Walsh* as being the surety, for payment of the same. That *Dugan* always alleged that he did not know *Davis* in the business, and that he had conveyed, or must convey, the property to *Walsh;* and when *Davis* applied to *Walsh,* he insisted *Davis* had nothing to do with the property, and that it belonged to him, *Walsh.* That *Dugan* hath actually conveyed the house and garden, and the lot on which they are situate, to *Walsh;* and that sometime in June last *Walsh* claimed of *Davis* £30, as rent for one year for the premises, and distrained for the same, altho' *Davis* saith that he never rented the premises of *Walsh,* or agreed to pay him any rent therefor, but always claimed the same in consequence of the said purchase; and that *Davis* was obliged to replevy the goods so distrained by *Walsh.* That *Walsh* hath instituted an action of ejectment in the county court of *Baltimore* against *Davis,* to recover the possession of the four lots No. 951, 952, 953 and 954, which include the property so purchased by *Stockton.* That within the last thirty days *Walsh* also served *Davis* with a notice, as if he had been a tenant of *Walsh,* to leave the premises within thirty days from the notice, in order to institute proceedings against *Davis* under the act, entitled, "An act to provide a summary mode of recovering the possession of lands and tenements holden by tenants for years, or at will, after the expiration of their terms." That on the 15th of February last, *Davis* did actually tender to *Walsh* the whole amount of the principal and interest of the purchase money, for which *Stockton* purchased the property, and demanded that *Walsh* should convey the same to the wife of *Davis,* and that *Walsh* refused to receive the money, or execute a conveyance. *Prayer,* that *Davis* and wife may be quieted in their possession of the premises; and that *Walsh* may be compelled by a decree to convey to the wife of *Davis* the property so purchased by *Stockton* for her use. *Prayer* also for *subpœna,*

1808.

Davis
vs
Walsh

and for an *injunction*, &c. The *answer* of *Walsh*, the defendant, admits that *Davis* applied for the, benefit of the insolvent law, and that the trustees named became entitled to his estate as the bill alleges, but the defendant has no knowledge whether any agreement ever took place between the complainants and *Dugan*, that in case the purchase money was obtained by them he was to convey the same to them. The defendant admits that the lots of ground mentioned were sold by *Dugan* at public sale as stated; and the defendant saith, that the complainant, *Mary*, came to him previous to the sale thereof, and mentioned to him that she and her husband were desirous of purchasing that part on which the improvements of a small house and garden were made, but expressed her apprehensions that they would be unable to accomplish the payments at the limited periods, and asked the defendant if he would consent to take the same to his own account, in case they were so unable, and the defendant did consent to do so. That at the sale of the property, which was distributed into three parts, the defendant became the purchaser of two third parts thereof, and that *Stockton* became the purchaser of the remaining third part, including the house and garden, as the defendant was informed and believes, in trust for *Davis*, in the event of his making the payments in 3, 6 and 9 months, that being the time limited at the sale thereof. That the defendant became the security of *Stockton* for the purchase money of the third part, to *Dugan*, and at that time also informed *Stockton* that he had made the promise, herein before stated, respecting the same, to Mrs. *Davis*. That before bonds for the conveyance of the lots of ground were executed by *Dugan*, the complainants severally came to the defendant, and informed him that they had determined not to have any thing to do with the purchase made by *Stockton*, and requested the defendant to take the whole upon himself, and obtain a bond in his own name for the conveyance thereof; at that time also the defendant consented to take the same upon himself, but observed to the complainant *Davis*, that it would be proper for him and *Stockton* to call on *Dugan* and request that the bond of conveyance should be executed to the defendant only. That shortly after this conversation, *Davis* and *Stockton* informed the defendant that they had waited on *Dugan* for that purpose. That at

another day, previous to the execution of the bond of conveyance, *Davis*, in conversation with the defendant relative to the property, and in order to induce the defendant the more readily to take the purchase upon himself, informed him that *Peter Litzinger*, the proprietor of the adjoining ground, would sell the same on reasonable terms, and advised the defendant to purchase the same, as he would thereby obtain the whole front on both sides of the street; and the defendant did accordingly purchase the opposite front from *Litzinger*. The defendant afterwards obtained the bond of conveyance in his own name; that he was pressed to take the same both by *Stockton* and *Davis*. That at the stipulated periods he paid the purchase money to *Dugan*, and has since obtained conveyances in fee for the whole of the property; and at the request of *Stockton* executed to him a bond of indemnity against the payment of the purchase money to *Dugan*. That *Davis*, at the time of the sale of the property, was considerably indebted to the defendant for goods sold and delivered, and that on that account he is now indebted to the defendant in the sum of more than £50. That after the defendant made the first payment for the property to *Dugan*, he informed *Davis* that he must pay £30 per annum rent. That he always considered himself entitled to recover that sum, and that *Davis* was his tenant at that rent, and compellable to the payment thereof by distress. That under this impression, and in consequence of *Davis's* refusal to pay the same, he levied a distress, and instituted such process for the recovery of the possession of the property, as stated in the bill. The defendant doth positively deny that he either, directly or indirectly, ever promised or gave any other assurance to the complainants, or either of them, or to *Stockton*, that whenever they paid the purchase money he would execute a conveyance for the third, or any other part, to *Mary* one of the complainants. That he does not believe any tender of money, on account of the pretended claim of the complainants, was ever made to any person, until nearly two years after the sale, when *Davis* came to the defendant's house, and told him that he came to tender him money for the property now possessed by the complainants, when the defendant answered, that as he had neither sold, nor promised to sell him, any ground, he could not receive any on that account, but would be thankful to receive and

1808.

Davis
vs
Walsh

apply the same to their credit for goods sold to Mrs. *Davis* two years before, which *Davis* refused, observing that that account should be paid in due time. That since the property hath been in the possession of *Davis*, the same hath suffered great injury, and the defendant has reason to apprehend, and doth believe, will be almost wholly ruined if suffered to remain with him; and the defendant is restrained from taking the possession thereof. The defendant doth positively aver, that he hath never, since the purchase of the property, promised or bound himself to permit the complainants the privilege of paying up the principal and interest of the purchase money, and taking the property; and expressly denies any trust whatever for their benefit. He denies the fraud and oppression charged by the complainants, &c.

A motion to dissolve the *injunction* was made by the defendant, which being submitted,

Hanson, Chancellor, stated, that the bill and answer were by him read and considered, and it appearing that the equity stated in the bill, on which the injunction was obtained, is fully denied by the answer; and there being no circumstances to induce the chancellor to continue the injunction until final hearing, or further order, it is adjudged and ordered, that the injunction be, and it is hereby dissolved.

*Commissions* issued for taking testimony, which were executed and returned, containing the following evidence.

*Joseph Stockton*    He affirmed that in the year 1793 he was present at the sale of a house and lot situated on *Hampstead* Hill, at the head of *Bond*-street, in the city of *Baltimore*, that the sale was made by order of *Cumberland Dugan*, the owner of the property, under the superintendance of major *Yates*, an auctioneer; that at the time of the sale, the premises were divided into three parts or parcels; that the affirmant, at the instance and request of *Mary Davis*, one of the complainants, with the knowledge and approbation of her husband, the other complainant, became the purchaser of the first part or parcel of the premises, whereon a house and garden were erected and laid out; that at the time of the sale it was publicly announced by the auctioneer, and was understood by the defendant, who was present, that the affirmant made the

1808

Davis
vs
Walsh

purchase as agent, and for the use of the complainants, that the defendant became the purchaser of the other two lots, parts or parcels of the premises; that the affirmant bid £130 for the lot which he bought, and that the defendant bid a larger sum (how much the affirmant cannot recollect,) for the two parts which he bought. That the affirmant and *Walsh* became mutually bound for each other unto *Dugan*, for the price of their respective purchases. That a few days after the sale, when the affirmant was about to leave *Baltimore*, it was agreed, by and with the knowledge and consent of all the parties, that *Dugan* should convey the whole of the premises, as well the lot purchased by the affirmant, as the other two lots, to the defendant; that when such conveyance was agreed upon, *Davis* declared it was done in confidence, and, as the affirmant understood, upon trust, that so soon as the defendant should be relieved from his suretyship on account of the lot purchased by the affirmant, the same should be vested in the complainants, for whose use it had been purchased; that the affirmant directed such conveyance to be made accordingly, and never understood or intended that the same should convey any other property or interest in the lot by him purchased as aforesaid, but on the terms, and for the purpose of indemnifying the defendant against the security into which he had entered as aforesaid. That at the time of entering into the security, mutually for each other, to *Dugan*, the affirmant received a bond from the defendant in the penal sum of £600, conditioned to indemnify this affirmant against the bonds which he had executed to *Dugan* for the purchase of the premises; that some time in the year 1795, subsequent to the commencement of the present suit, the defendant called upon the affirmant in *Philadelphia*, (where the affirmant then lived,) and produced and delivered up to the affirmant the bonds executed to *Dugan*, whereupon the affirmant delivered to the defendant the bond which the affirmant had received from him to indemnify the affirmant as aforesaid. That the complainants were in possession of the premises at the time of the sale, and continued so when the affirmant left *Baltimore*, with the knowledge, and as he believes with the approbation of the defendant.

*James Gottier.* He deposed, that sometime in the year 1793, soon after the sale of *Dugan's* property, the deponent, and *Ebenezer Graves,* were requested by the complainants to make a tender of the purchase money of the house and lot, which *Stockton* had bought for them at the said sale; that the complainants accordingly gave to the deponent and *Graves* the sum of £135, with an additional sum for interest, in order to make such tender. That the deponent and *Graves* made the first tender of the money to *Dugan,* but he said that he had already conveyed the premises to *Walsh,* and supposed that he would take the money. That the deponent and *Graves* then proceeded to the house of *Walsh,* and informed him that they were come to make payment for the house and lot which *Stockton* had purchased for *Davis* and his wife, who had given the money for that purpose; that the deponent and *Graves* tendered the sum, and interest aforesaid, and requested *Walsh* to count the same; that *Walsh* declared he had no doubt about the quality or quantity of the money, but observed that he had bought the premises for himself, and did not mean to sell again.

*Ebenezer Graves.* He deposed to the same effect above deposed by *Gottier,* fixing the time of the tender to the 15th of February 1794, as made to *Dugan;* and on the next day to *Walsh.*

Colonel *Thomas Yates.* He deposed that at the time he went to make the sale for *Cumberland Dugan,* the complainants both expressed their desire to become purchasers of that part of the property which included the house and garden, and that they should request Mr. *Stockton* to purchase the same for them; provided it did not go too high. He thinks *Walsh* and *Dugan* were present at the time of this conversation. The lots were laid off in three divisions, one of which division was to include the house and garden, to accommodate the complainants if they were able to purchase, and with the consent of *Dugan,* and made from the deponent's recommendation to *Dugan* at the desire of *Davis.* It was understood by the deponent that *Stockton* was bidding for the said part for *Davis* or wife, and believes it was so understood by *Walsh* and *Dugan,* as it was a subject of conversation at the time of the sale, and *Dugan* had consented to the division to accommodate *Davis* in the purchase, but he has no knowledge of their being acquainted with *Stockton's*

bidding for *Davis* or wife, other than his belief, founded on the circumstances already stated. He heard *Walsh*, sometime after the sale, inform *Dugan* that he had become security for *Stockton*, who being unable to pay, had directed the conveyance to be made for said part by *Dugan* to him *Walsh*.

*Cumberland Dugan.* He deposed that he purchased the property under an agreement to let *Davis* have the same, provided he paid the purchase money, and £50 to the deponent for his trouble, within twenty months from the day of sale; and if the purchase money, and the £50, were not paid by that time, the property was to be sold by the deponent, and the proceeds of the sale, if it exceeded the purchase money, and £50, were to be paid to *Davis*. That *Davis* and wife did express their desire to the deponent to preserve the house and garden for themselves, but he does not recollect that they mentioned it to *Walsh* or *Yates*. He does not know who applied to him for the purpose of subdividing the lots, but it was concluded upon between him and Col. *Yates*, that the property would sell better if it was so subdivided; and believes the subdivision was so made, in order to afford the complainants, or one of them, an opportunity to purchase in the division containing the house and garden. He does not recollect that it was declared, at the time of the sale, that *Stockton* bid for the said subdivision for the use and benefit of *Davis* and his wife, or one of them, but immediately after the sale *Stockton* said he had purchased for *Davis* and wife, with an intention to let them have the property, if they complied with the terms of sale; but he does not know whether the same was known by *Walsh*. That immediately after the sale, the deponent called on *Walsh* and *Stockton* to execute bonds agreeably to the terms of the sale, which they accordingly did, being securities for each other; and the deponent told them they might have bonds of conveyance when they pleased. Some days after the taking of which bonds, *Stockton* called on the deponent, and directed him to execute a bond of conveyance for the whole of the said lots to *Walsh*. The deponent did so, and the purchase money was paid to him by *Walsh*, to whom he executed conveyances. That sometime before the executing the said bond of conveyance, *Davis*, or his wife, called on the deponent, and told him it was perfectly agreeable that a bond

1808

Davis
vs
Walsh

1808.

Davis
vs
Walsh

of conveyance should be given to *Walsh* for the whole of the property; and the deponent understood that the complainants and defendant were then on good terms. He believes that *Walsh* did know, or had been informed, at or before the time when the bond of conveyance was executed, that *Stockton* purchased the property for *Davis* or wife. He believes that *Davis* called on him a short time before the first payment became due, and after the bond of conveyance had been given to *Walsh*, and said he would pay him $200, and give him security for the remainder, but the deponent said he could not do any thing in it, because the bond was nearly due, and he expected to get the whole, when it became due.

*Job Garretson.* He deposed that it was publicly said at the sale that *Stockton* bid for Mrs. *Davis;* that the deponent so understood it himself, and supposed it to be so understood by others, from the general conversation, and he believes it was so understood by *Walsh* and *Dugan*, and that *Dugan* told the deponent so. That at the time of the sale, *Stockton* told the deponent that *Walsh* had agreed to be security for him if he bought the property. That *Dugan* told the deponent that he supposed *Walsh* would be security for *Stockton*. *Walsh* afterwards said to deponent, he thought it was a pity that *Davis* and wife should be put out of the property, and that he had become security for the payment of the money, and that when they paid the money the property was theirs. That a few days before, *Stockton* went away, *Dugan* told the deponent that *Stockton* had a bond of conveyance, and that he might deed or assign it to *Walsh*, but whenever the money was paid, the property would be theirs, meaning *Davis* and wife. That *Stockton*, a little before, informed the deponent, that he was a good deal uneasy about his being security for *Davis*, for the purchase money of the said house and garden; that he was going to leave the place in a few days, and had a mind to let *Walsh* have it, and whenever *Davis* and wife paid the money, *Walsh* would let them have the property. On the deponent informing *Dugan* of this conversation, the preceding conversation with *Dugan* took place.

It was admitted that *Davis* remained in possession of the house and garden, until he was turned out by a writ of *habere facias possessionem*, issued on a judgment at law obtained against him at the suit of *Walsh's* lessee. That *Stockton*

removed out of the state shortly after the purchase, and before any part of the purchase money was paid. That the sale made by *Dugan* was after the time of the purchase made of *Davis's* trustees.

HANSON, Chancellor, (December term, 1805.) The cause standing ready for hearing, has been debated by the counsel on each side*(a)*, and the whole by the chancellor carefully considered.

How often does the chancellor think it proper to mention the principle on which the statute of frauds was framed, and principles in this court established. There is in this case no agreement, that the chancellor perceives. Is it necessary to say that a contract is a stipulation or agreement, or understanding, between two persons, each of whom is bound to do something on his part, and that if one is not bound, he has no right to consider the other as bound? It is true, that an express contract may be so made, as that one shall for a consideration be bound, and the other not bound without his own will. For instance, A and B make this agreement—A binds himself for the consideration of 10 dollars, before the 25th of December, to procure to B 10 hogs, for which, if B likes them, and chooses to take them, he shall pay at the rate of $8 per 100 wt. In this case agreement is clear, A is bound to bring the hogs; but it is at the election of B to take or reject them as he thinks proper, losing his $10. But if there be no consideration to A, it is not to be supposed that he is bound to bring the hogs, and B not bound to take them. This may indeed be considered as illustrating by the thing itself. Let it be said then, that in the present case there was, on the part of the complainants, no contract. There was no *actus contra actum;* there was no consideration flowing from them; there was nothing binding on them.

It has been contended, that *Stockton* only acted as trustee for the complainants, and purchased for them. But is there any proof, or even allegation, that he purchased with their money, or that they were bound to provide the money, or take the purchase from them? It has been insisted too, that as he made the contract in his own name,

(a) *Martin,* (Attorney General,) for the complainants, and *Winchester,* for the defendant.

the property was to be considered as a security in the hands of him, the nominal purchaser, and that as this was the case, the time stipulated for redeeming it was to be considered in the same light as the day of redemption mentioned in a common mortgage. There is no analogy, and it is not to be conceived that this court ought to determine, that although there was no consideration flowing from the complainants, and although there was nothing binding on them, *Stockton* should be obliged to convey to them at any time, when they should find it convenient to pay the money; and that at any period after the time stipulated, whoever should hold the property from, by, or under *Stockton*, after even twenty mesne transfers, should hold it subject to the will of the complainants to redeem it at any time. How would such doctrine comport with the interests of a young thriving town?

The chancellor does not conceive there is any solidity in the observation respecting answers in this court. The distinction is plain. Where a defendant first admits the allegations in a bill, and then sets up some distinct *after* transaction, by way of avoidance, he is bound to prove that transaction. But where a man is called on by a bill in this court to say whether or not there was an agreement between him and the complainant, and what it was, his answer, with respect to the nature of that agreement, is to be taken altogether. For instance, says the bill of A,—B contracted with me, by parol, for the consideration of $5000, to sell me 300 acres of land in *Baltimore* county, of which he put me in possession, but I was to have credit for five years without paying interest. B, in his answer, admits that there was a parol contract for the land, and possession given as stated; but instead of having credit as aforesaid without interest, A was to give him bond, with security, for paying with interest in three years. Will common sense suffer a construction as, that because B admits a contract and possession he must be considered to have admitted every thing necessary for A's purpose, unless he can prove, on commission, that the contract was as stated in the answer? No! the absurdity is glaring. But if B had admitted the matters stated in the bill to be facts, but went on and said that afterwards, A, for the consideration of $100, had agreed to give up the purchase, &c. that

part of the answer must be proved on commission, unless A, on interrogatories, had admitted its truth.

The chancellor thinks proper to make a remark, which ought to have come before—supposing *Stockton* really bound to convey on receiving the purchase money on or before such a day, inasmuch as the complainants were under no obligation whatever to take the purchase off *Stockton's* hands, and inasmuch as he had no valuable consideration, the utmost they could claim in reason would be to take the purchase off his hands by paying the money on the day stipulated. Suppose this case—they do not bring him the money on that day—property has fallen so much in value that it is not for their interest to take it on or before the day. He cannot compel them to take it. He does not wish to keep it, but to get free of it on the best terms. He sells it for $500 less than it cost him. Ten years after this the property is worth three times as much as it cost *Stockton.* Then, indeed, *Davis* and wife, whether or not they have money, can contrive to redeem, or claim it to advantage, provided it can be so redeemed or claimed. Well—the purchaser from *Stockton*, or the purchaser from that purchaser, or the purchaser from the second purchaser, is obliged, on *Davis's* application, to convey him the property on his paying, &c. It is really an affront to common sense to say that *Davis's* claim ought to prevail.

The chancellor has given his ideas at large. He might refer to decisions of the court of appeals, which if there be a judgment to be formed from decrees, the reasons of which are not assigned, are more strict with respect to agreements set up against the intent of the statute of frauds than the chancellor has ever seen.

The chancellor indeed has always thought that it would have been much better to construe the statute of frauds *strictly* against contracts. However he has always endeavoured to conform to decisions, which on any principle might be considered as binding on him. He has never intentionally decided against any decree of the Lord Chancellor of *England*, made before the revolution, or even any decision of Chancellor *Rogers*, which hath not been controverted, unless on a bill of review. As to the present case, he is satisfied, that by decreeing a dismission of the bill, he will contravene the principle of no decision in equity, which ever hath been given. *Decreed*, that the bill of

1808

M'Coy
vs
Swan

the complainants be dismissed, and the defendant be dismissed, but without costs.

From which decree the complainants appealed to this court. And the case was argued before CHASE, Ch. J. NICHOLSON, and GANTT, J. by

Martin, for the Appellants; and by
Harper, for the Appellee.

THE COURT Reversed the decree of the court of chancery, and decreed that the appellee convey the land in question to the appellants, in fee simple, and pay to them all the costs in the court of chancery, and in this court, and all the costs incurred by Davis at law in defending the action of ejectment prosecuted against him by the appellee, and that the appellee restore the possession of the land to the appellants. Also that an account be taken of the principal money and interest paid by the appellee for the land, at the respective times he paid the same, and that the appellants be charged therewith; and that an account also be taken of the rents and profits of the land, which have accrued and been received by the appellee since he took possession thereof; and in stating the account between the parties, the appellee be charged therewith at the respective times he received the same, with legal interest thereon; and that the balance of the money which may be due, on the adjustment of the said account, be paid to the party to whom it shall be due, whether appellants or appellee, at the time the appellee shall convey the land. And that the chancellor make all necessary rules and orders for having this decree carried into full and complete effect.

DECREE REVERSED.