WEBSTER *against* WOODFORD.

A man may show, that he was *non compos mentis* in avoidance of his deed.

MOTION for a new trial.

This was an action of ejectment, to recover the undivided moiety of certain lands, which the plaintiff and *Timothy Webster* had conveyed to *Miller Fish*. Upon trial of the cause, at *Hartford, February* term, 1808, a verdict was found for the plaintiff. A motion for a new trial was then made by the defendant, and the following reasons assigned; viz. that the court admitted the plaintiff to prove, as the sole ground of his right of recovery, that the plaintiff was a man of weak capacity, and thereby incompetent to convey estate; that the court admitted the plaintiff to go into the proof respecting the weakness of his understanding, in contradiction to the acknowledgment of two certain deeds of bargain and sale made and acknowledged before a justice of the peace, on the 17th day of *May*, 1799, which deeds conveyed the demanded premises to *Miller Fish;* that the court admitted the plaintiff to produce proof as to the value of the demanded premises, as evidence to show, from the inadequacy of price, that the plaintiff was a man of weak capacity. A rule to show cause was therefore granted; and the question reserved to be argued before the nine judges.

*Goodrich* and *Dwight*, in support of the motion, argued,

1. That weakness of understanding does not incapacitate a man to contract.

2. That no man can avoid his own deed, by stultifying himself.

1. There is a distinction, always to be regarded, between idiocy, and weakness of understanding; the one supposing a total destitution of mental capacity, the other implying the existence of understanding, though in a small degree. The term *non compos mentis* does not apply to a person of weak capacity, but only to one who possesses not the exercise of reason. It is the latter description of persons only, whose acts are void or voidable, merely for defect of understanding; and such only are contemplated, in *England*, by the statute 17 *Edw*. II., which was declaratory of the common law. 4 *Rep*. 126. For no person of the age of discretion, is, in law, presumed to be *non compos mentis*, and therefore is not to be restrained in the exercise of any lawful right, until he is ascertained to be so, by a commission issued for that purpose from the court of chancery. 3 *Bac. Abr.* 528. On this fact being thus found, the law gives the custody of the person and his estate to the king, that the person may be protected from harm, and the estate from waste. The immediate care of the lunatic may, however, be intrusted to one commissioned for that purpose, whose acts are subject to the control of the court of chancery. 3 *Bac. Abr.* 529. Hence originated our statute authorizing the appointment of a conservator; which gives to that officer the same authority which is possessed by the committee of a lunatic, and vests in the county courts powers similar, in this respect, to those of the court of chancery. This statute, directing the manner in which such persons, if without property, shall be supported, speaks of persons " *naturally wanting of understanding*, so as to be unable to provide for themselves," and of such as, " by the providence of GOD, fall into distraction, and become *non compos mentis;*" and of those who, " by age, sickness or otherwise, become poor and impotent.(a) And

June, 1808.

WEBSTER
v.
WOODFORD.

(a) *Stat. Conn.* tit. 88. c. 1. s. 1.

June, 1808.

WEBSTER
v.
WOODFORD.

in a subsequent section, it is said, " But if *such idiot*, distracted or impotent person have any estate, the county court of that county where they dwell, may order and dispose thereof." Here, while we remark, that the object of this statute appears to be the same with that of 17 *Edw.* II., the phraseology used in this section is to be particularly observed, as it shows, precisely, what description of persons was meant by those who are *naturally wanting of understanding*, mentioned in the first section. For, however reasonably the term, in itself, might be taken to extend to a person of *weak understanding*, yet since, referring to these persons, the phrase *such idiot*, is used in the subsequent section, this latitude of construction is evidently forbidden; and the meaning of the statute, in this part of it, confined to idiots, distracted persons, and those who by age, sickness or otherwise, become *poor and impotent*. The statute 17 *Edw.* II. says nothing of persons of weak understanding, but speaks only of *natural fools* and *lunatics*. *Bac. Abr.* 529.(*a*) Our statute, indeed, in another part (sect. 8.) goes farther than this, and provides, that if the selectmen " shall find any person or persons that are reduced, or are likely to be reduced, to want, by *idleness, mismanagement, or bad husbandry*, that then such selectmen may appoint an overseer to advise, direct and order, such person in the management of his business;" and that " no such person, while under such appointment, shall be able to make any bargain or contract, without the consent of such overseer, that shall be binding or valid in law." But on the subject of persons of weak mind, the statute is everywhere silent. By neither of these statutes, then, are such persons rendered incapable of making contracts. And although many cases have occurred, in which it appeared that advantage had

(*a*) See also Lord *Donegal's* case, 2 *Ves.* 407. *Ex parte Barnesley*, 3 *Atk.* 168.

been fraudulently taken of the imbecility of such per- <span>June, 1808.</span>
sons, and, on that ground, their contracts have been <span>WEBSTER</span>
annulled; yet it has been uniformly held, that where <span>v.</span>
that reason did not exist, they were not to be relieved, <span>WOODFORD.</span>
either at law or in equity. 1 *Fonbl.* 57. 3 *P. Wms.* 129.
*Osborne* v. *Fitzroy.* " Where a weak man gives a
bond, if there be no fraud, or breach of trust, in ob-
taining it, equity will not set aside the bond only for
the weakness of the obligor, if he be *compos mentis;*
neither will this court measure the size of people's un-
derstandings or capacities, there being no such thing
as an equitable incapacity, where there is a legal capa-
city." In the case of *Bennet* v. *Vade*, 2 *Atk.* 324., on
a bill brought by the heir at law of Sir *John Lee*, to set
aside the conveyance of his estate, upon a suggestion of
fraud and imposition, Lord *Hardwicke* agreed, " that if
Sir *John Lee* was not insane, but only weak, he might
do an act that will bind him; for there cannot be two
rules of judging at law and in this court upon the point
of insanity." If, then, mere weakness of understand-
ing does not incapacitate a man to contract, it follows,
that when he contracts without fraud or imposition, his
contract is binding. That this sale was affected in con-
sequence of any fraudulent practices on the part of *Fish*
does not appear. Nor is any other mark of fraud sug-
gested, than that the price was inadequate to the real
value of the land. It is conceded that such a circum-
stance as *total* inadequacy of price, coupled with great
weakness of mind, in the grantor, will raise strong pre-
sumption of fraud; but the facts which appear in this
case authorize no such presumption. Indeed, the court
admitted proof of the value merely as evidence of *Web-
ster's* weakness, and not of fraud or oppression on the
part of *Fish.(a)*

(*a*) How far inadequacy of price will operate to vacate a contract,
see *Ambl.* 18. 1 *Bro. Chan. Rep.* 9. 2 *Bro. Chan. Rep.* 175. 179.
10 *Ves.* jun. 474. 7 *Ves.* jun. 30. 8 *Ves.* jun. 137.

June, 1808.    [The counsel for the plaintiff here objected, that on

WEBSTER    the trial of the cause, they did not proceed on the

v.        ground that the plaintiff was a man merely of weak un-
WOODFORD.
          derstanding, but that he was *non compos mentis*.

SMITH, J., on referring to his minutes, then stated—
That on the trial of the cause, the defendant having
given in evidence two certain deeds from the plaintiff
and his brother *Timothy Webster*, conveying all the lands
in question to *Miller Fish*, the defendant's counsel ob-
jected to the admission of evidence to prove the incom-
petency of the plaintiff to convey lands; because the
deed, having been acknowledged before a public officer,
authorized to take such acknowledgment, there could
be no averment against such solemn act; and because
no man can be permitted to allege his own incapacity
to avoid a conveyance. The court overruled the objec-
tion, and admitted the evidence.]

This statement of the case seems not very obviously
to present a specific question. Are we to argue the
point, that proof of the plaintiff's *incompetency to con-
vey* should not have been admitted? If the evidence
offered were, generally, that he was *incompetent*, with-
out showing the reason of the incompetency, whether
*infancy*, *idiocy*, *lunacy* or *imbecility*, the point would
scarcely admit of argument. If the point is, that *no
man* can allege his own incapacity, we have no case; be-
cause *infancy*, clearly, may be alleged.

[TRUMBULL, J. I understand the question, upon the
statement, to be, whether a man may be allowed to stul-
tify himself.]

That a man cannot stultify himself, to avoid his own
grant, is a well established principle of the *English* law.
It is so said by *Littleton*, sect. 405.; and has been so

held in a multitude of cases, since his time. In
*Beverly's* case, 4 *Rep.* 123., it was resolved, " that every
deed, feoffment or grant, which a man, *non compos men-
tis*, makes, is avoidable, and yet *shall not be avoided by
himself*, because it is a maxim in law, that no man of
full age shall be, in any plea to be pleaded by himself,
received by the law *to stultify himself, and disable his
own person.*" A contrary opinion is, indeed, given by
*Fitzherbert. F. N. B.* 449. D. But in the case of *Stroud*
v. *Marshall, Cro. Eliz.* 398., in debt on an obligation,
*non sane memory* was adjudged to be no plea; and the
opinion of *Fitzherbert* expressly held to be not law.
So also *Co. Litt.* 247. And in *Cross* v. *Andrews, Cro.
Eliz.* 622., an action on the case against an innkeeper,
for not keeping the goods of his guest safely, in which
the defendant pleaded that he was sick, and of *non sane
memory;* this plea was held insufficient, because " it
lieth not in him to disable himself no more than in
debt upon an obligation." The principle is also recog-
nised by Lord *Holt,* in *Thompson* v. *Leach,* 1 *Ld. Raym.*
315.; and is found in 3 *Com. Dig.* 483. D. 6. 3 *Bac. Abr.*
537. 15 *Vin. Abr.* 137. D. 2. 1 *Fonbl.* 45. The utmost
danger is to be apprehended in admitting the doctrine,
that a man may stultify or disable himself in court; as
it is a direct contradiction to a plain maxim of the com-
mon law ; as it would give rise to endless disputes, and
would afford ample scope for fraudulent practices. It
need not be denied that inconveniences may sometimes
result from the doctrine for which we contend. If this
were a sufficient objection, it might be made, with equal
reason, against the establishment of all general princi-
ples. The inconveniences to be feared from admitting
the maxim of the common law, are, however, compa-
ratively small. With respect to absolute idiots and
madmen, the danger is nothing. But from the least
portion of intellect to the greatest, the gradations are
innumerable; and who shall determine at what point in-

tellectual weakness ends, and idiocy begins? There is, and can be, no standard of mediocrity. Leave men to the plain principles of the common law, and friends will take care of the weak and incapable. But if it is once understood, that the contracts of a person *non compos mentis* are void, all very weak men, if their friends shall think it for their interest, may be made, for this purpose, *non compos mentis;* and the imagination can scarcely explore the field of mischief to its limits. After all, we are aware it may be said, that this doctrine has been exploded in this state. It is true, cases have occurred, within the last fifty years, in which it has been held, that a man might stultify himself. Such decisions are found, however, only in this state; and our own state of society offers no reason to show that the operation of the *English* common law would be inequitable here. It cannot truly be asserted, that the adoption of this principle would create new rights, inconsistent with those which the contrary decisions have conferred; because this is not one of those cases in which a great mass of property has conformed itself to the decisions. By the *English* common law, the disability of a grantor to avoid his own deed, by showing insanity, affects not the rights of his heir or executor; since, for them, this is good reason to avoid the grant; (4 *Rep.* 124.) and the *heir* may even enter without a *scire facias.* 15 *Vin. Abr.* 136. D. As to the lunatic himself, the provisions of our statute sufficiently protect him. But if he be permitted to plead his own insanity, within what limits shall this liberty be confined? Suppose one called as a juryman declares himself insane. Is the fact then to be ascertained, and the question settled? Or one is elected to an office, and makes the same objection to serving. The same question is to be settled before he can legally be excused. An idiot or lunatic is certainly to be considered as personally removed from all civil ob-

ligations and duties to society.(a) But surely he should not be thus discharged, on his own plea, in a mere civil action. The public have an interest in the question; and no man should be disfranchised or discharged from his public duties, until his idiocy or lunacy has been solemnly established by a public inquisition. And can the law be called a safe one, as it respects the public, or individuals, that a man may, by mere civil plea, discharge himself from his duties to society, and cut himself off from its privileges? In criminal cases, indeed, the party accused may excuse himself on the ground of insanity; and with great propriety; for the law, here, only concurs with reason and humanity, which revolt at the idea of punishing a man for the commission of a crime of which he must have been unconscious, and the restraints to which have been removed by the mere act of Providence. But in such cases, the question of insanity is decided on a charge made by the public, in an issue to which the public is party. It is also unavoidable; because we are under a necessity either to admit the plea, or run the hazard of punishing a man who is not a moral agent. It may be said, on the whole, that this is always a question of much importance; deeply affecting the welfare of the party, and the interest of his friends; and one in which society have a near concern. Its determination should, therefore, be accompanied with more solemnity and caution than can attend the hearing of an incidental plea in a civil action.

In addition to the reasons alleged against the general doctrine, it is to be observed, as to this particular case, which is an action of ejectment in the usual form, that from the declaration the defendant has no notice of the

June, 1808.

WEBSTER
v.
WOODFORD.

(a) " Fools and madmen are tacitly excepted out of all laws whatsoever." 15 *Vin. Abr.* 137.

June, 1809.

WEBSTER
v.
WOODFORD.

ground of the plaintiff's claim, and therefore cannot be prepared to disprove his idiocy.

*E. Perkins* and *Brace*, contra. The doctrine, that a man can in no case be admitted to stultify himself, although now received to be law in *England*, was not anciently so considered; nor has it been, in modern times, universally approved of, or acquiesced in; for to some, as is said by Lord *Coke*, the civil law, by which all acts done by idiots or persons *non compotes mentis*, without their tutor, are utterly void, seems more reasonable than the common law. 4 *Rep.* 126. There is, in fact, much absurdity in permitting persons under the age of twenty-one years, to avoid their own deeds, because they are supposed wanting in discretion to contract, and yet denying this privilege to idiots and lunatics, who must be, at least, equally destitute of discretion. The common law, indeed, tacitly admits this absurdity; for while it leaves utterly without remedy the party from whom Providence has withheld the means of self protection, and who, therefore, more needs the protection of the law, it still makes the grant of a person *non compos* voidable by the king, and by the representatives of the grantor. What good reason, if any, there may have been for the distinctions which are found(*a*) between the cases of infants and persons *non compos*, as to their capacity to contract, and for many consequent distinctions, it is now impossible to discover. These distinctions, which seem to have been the result of a departure from the course which common sense dictates, *Fitzherbert*, in his comments on the writ of *dum fuit non compos mentis*, does not scruple to reject as groundless. His opinion has been alluded to, and is strongly opposed to the modern doctrine. " Some have said, that writ lieth not by him who alieneth the land, because he shall not dis-

(*a*) See *Co. Litt.* 247. 4 *Rep.* 125.

able himself, nor contradict his own deed; but that seemeth to be little reason; for this is an infirmity which cometh by the act of GOD, and it standeth with reason that a man should show how he was visited by the act of GOD with infirmity, by which he lost his memory and discretion for a time." He then shows an analogy, as to want of discretion, between *insanity* and *infancy*; and because an infant may allege that he was within age at the time of his feoffment, " *à fortiori*, then he who is of *non sane memorie* shall allege that he was not of *sane memorie* at the time of his feoffment or grant, for he who is of unsound memory hath not any manner of discretion." In this opinion, although it has been held no law, *Fitzherbert* is not singular. The same has been, at least, intimated by Sir *William Blackstone*, 2 *Com.* 296.; and *Buller's N. P.* 172., says " The defendant may give in evidence that he made him sign it (an obligation) when he was so drunk that he did not know what he did; *or that he was a lunatic at the time.*" This was done in the case of *Yates* v. *Boen*, 2 *Stra.* 1104. And in *Thompson* v. *Leach*, 3 *Mod.* 310., the court expressly say, that the grants of infants and persons *non compotes*, are parallel, both in law and reason; and that as there are express authorities(*a*) that a surrender made by an infant is void, therefore, the surrender then in question, made by a person *non compos*, was also void. Though this conclusion will not, perhaps, be denied, it will still be said, that the reason for which the grant is void, if it be insanity, and not infancy, is not to be shown by the party himself. But why is not the parallel to be carried through? Because, in the language of the common lawyers, " when he recovers his memory, he cannot know what he did when he was *non compos mentis*." This, in reality, is exactly the reason that common sense would suggest, why he *should be* permitted to avoid his

(*a*) *Lloyd* v. *Gregory*, *Cro. Car.* 502.

grant. The reason, however, has been perverted to a wrong application, by indulging in speculations too refined for useful practice, but which cannot, perhaps, easily be shown, on abstract principles, to be false. A man, it is said, cannot remember an act done by him while he was devoid of reason and of memory; and must, therefore, afterwards be unable to say any thing respecting it. Without inquiring how far mental derangement may impair the memory, we venture to say, that the *fact* may as safely, and as consistently with good sense, be allowed to be *put in issue* by the party himself, as by his *heir* or his *executor*. In criminal cases, this is always permitted, though it would be difficult to show, that criminal acts committed by the party during his insanity can better be remembered by him, than acts of a different nature. The maxim, however, there is reason to believe, is peculiar to the common law of *England;* and was, as we are told by *Fonblanque*, " endeavoured to be set up by the common lawyers in defiance of natural justice, and the universal practice of all the civilized nations in the world." Certain it is, the maxim has not yet been adopted in *Connecticut*, but has been opposed by many contrary decisions ; as is agreed by the counsel for the defendant. Here, indeed, the reasons against the adoption of this doctrine, aside from these decisions, apply with peculiar force; because here a *scire facias* does not lie to avoid the alienations of a person *non compos mentis;* nor can actions against him be set aside by *supersedeas*, as in *England*. So that, notwithstanding the provisions of our statute, he is left without efficient protection, if his plea of *non sane memory* is refused.

BY THE COURT unanimously. It is not a question, whether a deed, executed by a person *non compos mentis*, is voidable, for want of capacity in the grantor to convey. All admit that it is; and that such a deed may be

avoided, in a court of law, by the heirs of the grantor; <span style="float:right">June, 1808.</span>
although, it is said, that by the common law, this cannot be done by the grantor himself. That this doctrine is supported by decisions of the *English* courts is true; and the reason assigned by those courts is, that a man shall not be admitted to stultify himself. But this was not always the common law of *England*. Certain it is, there is a writ in the *register* given to a man who has been insane, and who, during his insanity, has aliened his land, to recover it, after his reason is restored. In the time of *Edward* the First, *non compos mentis* was allowed to be a sufficient plea to avoid a man's own bond. It was not until the reign of *Edward* the Third, that any scruple was entertained respecting the power of a person, who had been *non compos mentis*, to avoid his act; and it was as late as the reign of *Henry* the Sixth before there was any judicial determination, that a person who had been *non compos mentis* could not avoid a deed given by him, during his insanity. This determination was followed by similar decisions, and received by most of the *English* writers to be settled law. Justice *Blackstone* observes, that this doctrine sprung from loose authorities; and he manifestly approves the opinion of *Fitzherbert*, who rejects the doctrine, as contrary to reason. He says also, that later opinions, feeling the inconvenience of the rule, have in many points endeavoured to restrain it. This rule has been supported with great earnestness by *Powell*, who gives a reason in support of it, which is not to be found in the books, *viz.* that a different rule would open a door for fraud; because a man might feign himself *non compos mentis*, that he might enjoy the privilege of avoiding his contracts, if he chose to do so. This reason affords no additional support to the opinion, that a person *non compos mentis* cannot avoid his deed; since the same temptation exists, in the present state of things, to commit fraud; for although the person cannot, himself, avoid his deed,

<span style="float:right">WEBSTER<br>v.<br>WOODFORD.</span>

June, 1808.

WEBSTER
v.
WOODFORD.

by showing insanity, yet by a proceeding in *England*, founded upon a writ issuing out of chancery, to certain commissioners, a person may be found *non compos mentis,* and immediately, in his life-time, a *scire facias* may issue in the name of the king, who by law is guardian to all persons *non compotes mentis;* and the deed of any one who is so found, by the proceeding, may thus be avoided. Application may also be made, in such cases, in chancery, by the attorney-general to vacate the deeds. Thus, that which cannot be done directly, by the insane person himself, in the ordinary mode of proceeding in courts, may be done circuitously, and that in the life-time of the insane person. The temptation to fraud is, therefore, as great as if he were allowed to plead his incapacity in the ordinary method. When we find that the ancient common law was, that a man might allege his own incapacity to avoid his deed, and that this remained law during a long period of time, and has never been altered by any legislative act, but the contrary doctrine depends upon decisions of courts, in direct opposition to the common law, whose business it is to expound, and not to make, the law; and that these decisions have been rejected as not law, by some of the most eminent lawyers, and with reluctance submitted to by others, who reprobate them as productive of great inconvenience; and that we have no such proceedings by *scire facias*, or bill in equity, to avoid the acts of a person *non compos mentis*, during his life; and that, if this be done at all, it must be by such person's alleging his incapacity, as is done in this case—we are not inclined to advise a new trial.

New trial not to be granted.