Bland, Chancellor.
Ordered, that this application to reinstate the case stand for hearing on-the fourth day of January next; — that depositions taken by either party on one day’s notice may be read in evidence at the hearing; — that the Chancellor will at the hearing require the personal presence of the complainant for the purpose of informing himself upon the subject of this application; but he desires it to be distinctly understood, that the complainant must not be removed from home so as to subject her to great personal inconvenience, or so as to endanger the *372 health of one so advanced in years, and reduced by infirmities. The relation however in which all the parties concerned stand to the complainant will, it is believed, insure proper respect and attention to her personal comfort and security. And the register is directed to transmit a copy of this order to the solicitor for the defendant.
The taking of proofs and the hearing of this matter were several times postponed at the instance of the plaintiff’s solicitors; and a further short delay having been granted by an order of the 29th March 1827, the matter was soon after that brought before the court.
17th April, 1827.- — Bland, Chancellor. — The matter of the petition to reinstate this case standing ready for hearing, the solicitors of the parties were fully heard; all the proceedings and proofs were read; and the plaintiff, Colegate D. Owings, having been brought into the presence of the Chancellor, he interrogated and conversed with her as to the subject in controversy, and also on various matters having a tendency toward, or connected with it. All of which the Chancellor has deliberated upon and maturely considered.
The case is of a peculiar and extraordinary nature. It is not alleged, nor does it in any way appear, that at the institution of this suit any thing was done that ought not to have been done; or that this proceeding was an improper one with a view’ to the rights and interests of the plaintiff.(a) A cloud has been impended over the title to the property mentioned in the proceedings, which threatens to gather and thicken by delay. The means of dispersing it, the proofs in relation to the controversy, may be more entirely, readily, and cheaply obtained now than at any future period; therefore, justice as well as the peace and interests of all concerned, seem strongly to require that the suit which had been begun should be reinstated, and now prosecuted with as little delay as may be to a final decision upon its merits, as prayed by the petition.(b)
The order for dismissing it was given before the return of the commission for taking testimony; and, as it would seem, before all the testimony, pertinent to the matter and within reach of the parties, had been taken. For it appears, that some of the proofs collected under the petition might be brought to bear upon the principal case. I therefore deem it improper at this stage of the *373 proceedings more fully to explain the reasons which have brought me to the conclusion, that the case should be reinstated, lest, in doing so, I might he supposed to intimate any opinion which should be reserved until the final hearing.
It is not my intention to say any thing as to the commencement of the decline of the mental energy of the plaintiff; or to speak of the lucid intellectual efforts she maybe now capable of making; but, although it does not appear to he altogether settled according to the English authorities, that a writ in the nature of a writ de lunático inquirendo can be issued against any one who is merely in a state of dotage,(c) I deem it proper to observe, that from the proofs of the present condition of the plaintiff’s mental faculties, I shall regard her as completely under the especial protection of the court as she can he, short of her being formally placed under its guardianship by a regular course of judicial proceeding.(d) I shall expect, that she shall be subjected to no manner of improper restraint, or disagreeable influence, not indispensably necessary for her welfare. If necessary, and it should be asked, the rents and profits of the property in controversy may be applied, under the direction of the court, to her support and benefit, until a final decree can be had. And as an imbecile adult may be permitted to sue here by his next friend,(e) I shall allow this suit to he henceforward conducted by the solicitors, by whom it was instituted, in the name of this plaintiff; subject, however, to the control of the court, should there be any occasion for its interference.(f)
*374 Whereupon it is ordered, that the said suit heretofore instituted in this court by Colegate D. Owings against Charlotte C. D. Owings, which was dismissed on the 31st 'day of August last by order of the said plaintiff, be and the same is hereby reinstated, in all respects, as it stood before it was so dismissed. And it is further ordered, that the commission with the testimony taken under it, which was returned and filed on the 6th day of November last, stand and be available in the said case, subject to all legal exceptions, in like manner as if the same had been returned and filed before the case had been dismissed.
On the 23d of June 1827, the solicitors of the parties by a writing signed and filed by them, agreed, that all the testimony which had been taken in relation to the application to reinstate the case should be used at the final hearing, in like manner as if it had been taken under a regular commission.
After which the plaintiff’s solicitors filed a representation in which they say, that by virtue of the order of the 17th of April they deem it their duty to state, that the plaintiff had been living in peace and comfort’ with her daughter Mrs. Nesbit, and on her leaving home to go to the springs for her health, the plaintiff had gone to reside with her daughter Mrs. Goodwin, where she had every attention and comfort she required; that on the plaintiff’s expressing a wish to attend a camp-meeting, Mrs. Goodwin had gone with her, but found it necessary for the plaintiff to take shelter from a shower of rain, in the house of a neighbour, when, in the absence of Mrs. Goodwin, the defendant contrived in a rude and covert manner to have the plaintiff put into a carriage and conveyed to the city of Baltimore, and there placed her, against her consent, in a boarding-house, where she could not have those attentions, conveniences, and comforts of which, from her age and infirmities, she stood so much in need; that the defendant, independently of her want of means properly to support her mother, ought not, because of this controversy, to have the care of the plaintiff; and that the real and personal estate of the plaintiff had been and was then much neglected and exposed to waste and loss. Upon which they suggested, that the person of the plaintiff should be confided to the care of Mr. and Mrs. JVesbit; and that a receiver should be appointed to take care of her estate.
17th September, 1827. — Bland, Chancellor. — The Chancellor has read and considered the statement filed and submitted *375 this day by Messrs. Winchester and Cwinn, the solicitors of the plaintiff.
On passing the order for reinstating this case, it seemed doubtful whether the plaintiff was then in such a state of dotage as to warrant the issuing of a writ de lunático inquirendo. Such a -writ was not asked for by any one. The expression of an opinion to that extent therefore, was not then considered necessary; and it was deemed best to leave the question as to the commencement and nature of her mental imbecility, as regards the matter in dispute, to be determined at the final hearing. Upon mature deliberation it seemed at that time, however, to be within the scope of the powers of this court to protect the- plaintiff, without the intervention of a writ de lunático inquirendo, from all personal restraint, or undue influence in any way, or by any one; and also, by the appointment of a receiver, or otherwise, to protect the property in litigation from waste, and to have its proceeds applied to her support until the matter in controversy could be, heard and determined. With a view therefore, as speedily as possible to release this aged plaintiff from all improper restraint, and of placing her in a condition of undisturbed comfort, and of having the property in dispute taken care of,
It is ordered, that any two or more of the medical professors of the University of Maryland, who have not heretofore expressed any opinion upon the intellectual condition of the said plaintiff Colegate D. Owings, be and they are hereby authorized and requested to visit and converse with her; and that she be permitted without the least molestation or undue persuasion whatever, from -any one, forthwith, or at any time to go to and dwell in the house of any one willing to receive her, as may be thought proper or advisable by the said physicians, or a majority of them. And the said physicians shall as soon as practicable make report to this court of their proceedings, and of their opinion of the health and present intellectual condition of the said plaintiff, (g) And it is further ordered, that the matter of the said representation of the said solicitors be finally heard and disposed of on the twenty-third day of October next. Provided a copy of this order, together with a copy of the said representation be served on the said defendant, or her solicitor, on or before the twenty-fourth instant. Each party *376 is allowed to take depositions before any justice of the peace, or the commissioners of this court in the city of Baltimore, to be read in evidence at the hearing of this matter on giving two days’ notice as,, usual.
Nothing having been done under this order, the case was, on the 28th November 1827, ordered to stand for hearing at the then next December term, unless cause was shewn to the contrary; and no cause having been shewn, the case was brought before the court for a final decision.
20th February, 1828. — Bland, Chancellor'. — This case standing ready for hearing and having been submitted, without argument or notes, the proceedings were read and considered.
The bill charges, that the deed of the 15th of June 1824, was obtained by combination and fraud; which of itself, if true, would afford a sufficient ground for the relief prayed. But this allegation is especially bottomed upon the statement, that at the time the deed was executed, the plaintiff had been deprived of her intellectual faculties; and that she was then in truth entirely non compos mentis ; either from great age, or by reason of the disorder under which she was then suffering. She makes her own incapacity the chief basis of her prayer for relief. But, according to a maxim of the English law, no man can be allowed to stultify himself for the purpose of avoiding his own deed. (h) If we are bound by this maxim; and it be an established principle of our law, it is evident, that every thing in this case, which can be considered as at variance with it, must be rejected ; and we must be confined to that alone which relates to the allegations of fraud, in total exclusion of every thing respecting the plaintiff’s personal disability occasioned by her alleged insanity.
The application of this maxim to this case, therefore, meets us here, as a preliminary inquiry. Can the unfortunate or afflicted party himself make his own insanity a foundation of relief or defence? , Is it a principle or maxim of the law of Maryland, “that no man of full age shall be, in any plea to be pleaded by him, received by the law to stultify himself, and disable his own person ?”(i) I have not been able to find any adjudged case, or other respectable authority, shewing in what manner this maxim has been received; or whether it has ever been adopted or rejected *377 in this State. Therefore, whether it ought to be now received, or rejected, must depend upon the nature of the reasons and the.policy by which it is sustained.
In England, it is said, that the progress of this notion is somewhat curious; and although it has been handed down as settled law, yet, that later opinions, feeling the inconvenience of the rule, have in many points endeavoured to restrain it. (j) This maxim has received the éntire approbation of few of the English lawyers, and, by many of them, it has been not only questioned, but severely reprobated, (k) It is alleged to have been set up in defiance of natural justice and the universal practice of all the civilized nations in the world. (l) It has been shewn from the most unquestionable authority, that the ancient common law, without deviation, down to about the year 1330, recognised the right of the party himself to rely upon and prove his own insanity as a means of avoiding any contract made during his insanity ;(m) and in a case which was decided about .the year 1420, it appears that the plaintiff was permitted to allege as the ground of the relief he asked' and obtained, that he was of great age, and that his discretion many times, and for the most part, had passed away from him, and that the bargain had been made when he wás out of himself. (n) It is said by one of the most eminent of the English judges, sitting in an ecclesiastical court, that it is perfectly clear in law, that a party may come forward to maintain his own past incapacity, and also that a defect of incapacity invalidates the contract of marriage, as well as any other contract, (o) After the most solemn and deliberate investigation, this maxim has been rejected in Connecticut; and in New York and Virginia it seems to have been put aside as unworthy of the least consideration or notice, (p)
Mere weakness of mind alone, without imposition or fraud, forms no- ground for vacating a contract. But if there be any unfairness in the transaction, then the intellectual imbecility of the party may be taken into the estimate, to shew such fraud as will afford a ground for annulling it. Courts of justice disclaiming all pretension to measure men’s capacities, recognise' no legal distinc *378 tion but that which is drawn between persons of sound mind, and those who are non compos mentis. Alb persons in the former condition of mind, not otherwise disqualified, may make a valid contract; but all contracts made by those in the latter situation are deemed utterly void.(q) And yet, according to this maxim, no mancan be allowed to stultify himself; that is, to shew that he had not merely a weak mind, but that he was absolutely non compos mentis. If a man be of ever so feeble a capacity, short of lunacy, he may be allowed to prove that fact; or, in other words, partially to stultify himself in connexion with other circumstances, in order to shew that he had been defrauded. But if he be absolutely non compos mentis, he shall not be permitted to prove that fact, or to stultify himself altogether ; although it would seem to be difficult to understand how the obtaining from a lunatic a conveyance of his property, can be otherwise considered, than as being in itself the strongest and most conclusive evidence of fraud. Hence, as it would seem, if the injured party should state, that being of a weak mind, he was imposed upon and defrauded; the defendant has only to prove an aggravation of his own iniquity, by shewing that the plaintiff was, in truth, at the time, not merely weak, but actually non compos mentis, and he maybe at once silenced by this’maxim.
It is said, that a man should not be permitted to stultify himself, “ because, when he recovers his memory, he cannot know what he did when hp was non compos mentis.” But this cause of the rule, as thus expressed, conveys a contradiction in terms, a solecism in itself. A man in madness is not himself; his mind is aliened and gone; the rational power has left its tabernacle, and is from home. It would be just as reasonable to say, that he who is absent from his dwelling, should not obtain redress for any injury done to it during his absence, because when he returned home he could not know what had been done there while he was abroad; as that a person 'should not obtain redress by stultifying himself, because he could not know what he had done during the time he was insane. It has been well said, that he who jests upon a man who is drunk, injures the absent. But an innocent and unfortunate person is much more really and totally absent from himself in his madness, than a man in his drunkenness.(r)
*379 It is the special duty of the State to take care of those who suffer under any natural infirmity which incapacitates them from taking care of themselves. And, therefore, to adopt a maxim which in its operation casts them out from. the protection of the law, of which they stand so much in need, and leaves them to be stripped of their property by the most palpable fraud, appears to be exceedingly unjust and cruel. The reason of this maxim does, in effect, declare, that the unfortunate are to be left unprotected, because they are unfortunate; that no care is to be taken of an innocent lunatic, because, being a lunatic, he knows not what he does, and cannot take care of himself. ' While on the other hand, it virtually proclaims, that iniquity shall be protected, and that the defrauder shall be allowed to profit by his own wrong, and to enjoy his plunder in perfect security.
It is said, that “ if the common law had given a writ of non compos mentis to him who has recovered his memory after alienation, certainly the law would have given him remedy for the maintenance of himself, his wife, children and family, although he recovered not his memory but continued non compos mentis.’(s) I do not clearly see the force of this inference; but it would seem, from what is said, that because a man cannot have a deed set aside *380 in order to recover his property, he is therefore utterly without remedy for the maintenance of himself and family during the continuance of his insanity.
This however is not altogether correct. A right of property necessarily implies, that its owner has a remedy for the recovery of it; and also, that he is invested with the means of protection in the enjoyment of such property as the law allows him to dispose of without any other limit than that in doing so he shall not injure his fellow citizen. But if ‘the owner has a wife and children he is bound to maintain them, at least so far as his property affords him the means. This maxim applies only to the contracts of the lunatic; it does npt prevent him from vindicating his right to his property by an action of ejectment, trespass, trover, &c.(t) nor does it release him from any obligation, which his property will enable him to discharge. Now it is in execution of this his own right, and in fulfdment of this his duty to his family, that the Court of Chancery has always acted, in taking care of persons who are non compos mentis, and their estates. For the court is bound, in behalf of the State, to keep the lunatic, his wife, children and household with the profits of his lands and estate, and to apply the whole to their use; although he.recovers not his memory, but continues non compos mentis.(u)
But we are told, that- although the lunatic himself may be fettered by this maxim, yet there is a mode in which he may obtain redress; and that his heirs and personal representatives are not bound by this maxim. A commission of lunacy may be taken out, he may be declared a lunatic, and a committee appointed to take charge of his person and estate; and such committee'may sue and have any deed, made by the lunatic, during his insanity, vacated for his benefit. But why this circuity? The issue joined between the committee of the lunatic and his grantee must be exactly the same, and it must be met by precisely the same proof as if the lunatic himself had been the párty. But even this circuitous mode of redress, is often lame, tardy, or wholly inefficient. It is, however, better than none at all.
But if a lunatic, in the condition of having been defrauded of his property, should recover his reason, then there is an end even of this circuitous remedy. He is discharged from the government and protection of his committee, and left to regain his property as *381 lie can; taking care, however, that he does not allege his own former insanity as a ground for vacating any contract by which he may have been defrauded of it. Hence as regards his property, the recovery of his reason, instead of being a blessing, may be his greatest misfortune; for he may, notwithstanding he is in fact the owner of a large estate, be by the operation of this maxim, fixed in penury during the remainder of his days. The granting of a commission of lunacy it is said, is a matter not of right but of sound discretion under all circumstances.(v) But if this maxim prevails it should be held to be a matter of right, since it may be often indispensably necessary as the only means by which a lunatic can obtain justice.
The heirs and personal representatives of the lunatic are, however, not restrained by this maxim. They may obtain the redress which has been denied to him. The heir may recover the imperishable realty; but of whom is reimbursement to be obtained for the years of waste and devastation that may have been committed upon it during the life of the lunatic ? The only remedy against the wrongdoer, in its best form, is a mere personal claim for an account of the rents and profits ; but he may be a beggar. The administrator of the lunatic may reclaim his personal property itself, if to be found; or if not, he may sue for its value, if the wrongdoer can be found; and recover from him its full value, if he should be worth as much. He who delays to pay what is due, pays less than is due; but suspended and indefinitely deferred justice is a tantalizing pernicious mockery. It appears to be most extraordinary, that any code of laws should recognise a case in which the existence of a wrong is admitted, and the redress for it is postponed until after the death of the injured individual, (w)
There is, however, one highly respectable English lawyer who has attempted to vindicate this maxim. “ Insanity,” says he, “ being a quality annexed to the mind of the party who is subject to it, is a conclusion upon his state of mind to be drawn only from his own actions. A person therefore may.assume this disability, whereas he cannot feign infancy and duress, the proof not originating in himself and his actions, but subsisting independently. That being the case, the law (which is anxious to provide against the possibility of committing fraud, at the same time that it provides for the protection of rights,) removes the temptation to prac *382 tise the former, by prohibiting every man from setting aside his own deliberate acts by stultifying himself, although it furnishes a means by which his heirs, after his death, or his friends, whilst he is living, may avail themselves of this disability. And it is to be observed, that the law in these cases does not proceed upon the ground, that the party is bound; for that cannot be, seeing that, by the law of nature, he wants the capacity to assent to a contract; but because the policy of the law, which rather submits to particular mischief than a public inconvenience, sets bounds to the law of nature in point of form and circumstance.”(x)
The argument, here derived from considerations of public policy, results in this; that a greater amount of fraud and injustice would be likely to ensue by allowing men to stultify themselves, in order to avoid their contracts, than by refusing them permission to do so for that purpose; And this position is founded on an assumption of the fact, that it is exceedingly easy to counterfeit madness without being detected; or that of those who do deceitfully pretend to be insane the far greater number escape detection; and consequently, but for this maxim the appearance of lunacy would be very frequently put on, for the purpose of practising imposition and fraud. The position however, is not sustained by the fact. It is incumbent upon those who advance this argument to shew, that instances of feigned madness are common; and also that in those instances the detection of the deceit has been rare or difficult. In criminal cases, to defeat the progress of justice, and under various circumstances to escape from oppression or some imminent peril, the artifice of counterfeiting madness has often been resorted to; but no instances of fraud in civil cases, perpetrated by means of pretended lunacy, have been adduced, and I know of none.(y)
*383 The doubtful and uncertain point at which reason disappears, and where incapacity becomes evident and manifest, can only be fixed by the particular circumstanc.es of each particular case. And it must be admitted to be difficult to lay down, with any thing like positive precision, any rules by which the sanity of the mind can be tried. Insanity is, however, a fact; and like every other fact, upon which the rights of persons or of property may depend, must be established by proof clear, strong, and demonstrative.(z) In cases of this sort, the evidence of medical men is, in general, produced; and, in proportion to the great improvements in that branch of science, such evidence is now more than ever to be relied upon, (a) I therefore deem it a sufficient answer to this argument, derived from considerations of public policy, to deny the truth' of the fact upon which it is based; and to rely upon the circumstance, that if there ever had been any such foundation for it, we should not, at this day, be at a loss to find any clear evidence of those facts in any foreign code, or in the innumer *384 able English reported adjudications in relation to the subject of insanity.
It is admitted, that many of the wise and sound maxims of the law are founded on considerations of public policy. But it by no means follows, that they are each of them similar and in principle alike; or that they do, in any respect, sustain each other by analogy. Upon considerations of public policy, the law will not permit the verity of certain public acts and judicial records to be called in question; but the foundation of that rule, it is evident, is very different; — indeed it is admitted to be directly contrary from that of this maxim, in relation to contracts.(b)
Upon the whole, I am clearly of opinion, that this English rule, which declares, that a man shall not stultify himself by his own plea, never has been, and ought not to be considered as a part of the law of 'Maryland. And having thus disposed of this preliminary point, upon the determination of which the nature of the further investigation of this case so essentially depended, I feel myself now at liberty to take every view of it which the pleadings and proofs will warrant; and to dispose of it upon the' established rules of equity, and the' broad principles of natural justice; and shall proceed accordingly.
Before I go into an examination of the proofs, it seems to be proper that something should be said respecting the general nature of insanity, or that unsound condition of the human mind, to which so large a portion of the testimony relates ; and, upon a just conception of which infirmity, a correct determination of this case so mainly depends. “Madness,” says Sir William Scott, “is a state of mind not easily reducible to correct definition, since it is the disorder of that faculty with which we are little acquainted; for all the study of mankind has made but a very moderate progress in investigating the texture of the mind, even in a sound state. In disease, where it has pleased the Almighty to envelope the subject matter in the darkness of disease, it will probably always continue so; but the effects of this disordered state are pretty well known. We learn from experience and observation all that we can know, and we see that madness may subsist in various degrees, sometimes slight, as partaking rather of disposition or humour, which will not incapacitate a man from managing his own affairs, or making a valid contract. It must be something more than this; *385 'something which, if there be any test, is held by the common judgment of mankind, to affect his general fitness to be trusted with the management of himself and his own concerns. The degree of proof must be still stronger, when a person brings a suit on allegation of his own incapacity, by exposing to view the changes of his mind.”(c) And an eminent physician, in “An Inquiry concerning the Indications of Insanity,” observes, that “the same intellectual.light may be given to all; but in some obscured by a gross organization, and in others, more happily organized, shining forth more brightly. Itself out of the reach of physical injury, it works by physical instruments; and the exactness of its operations depends on the growth, maturity, integrity, and vigour of its instruments, which are the brain and nervous system. If the nervous agents of sensation are unfaithful, the mind receives false intelligence, or transmits its orders by imbecile messengers : if the seat of thought, the centre of intellectual and moral government, is faultily arranged; the operations of the understanding are impeded and incomplete. Nay, so dependent is the immaterial soul upon the material organs, both for what it receives and what it transmits, that a slight disorder in the circulation of the blood through different portions pf nervous substance, can disturb all sensation, all emotion, all relation with the external and the living world; can obstruct attention and comparison, can injure and confound the accumulations in the memory, or modify the suggestions of imagination.”(d)
• The plaintiff has been subject to attacks from.a disorder, that has repeatedly darkened her understanding with delirium; the proofs exhibit some of her conduct as indicative of' lunacy ; and that dotage, or intellectual weakness, which the bill represents to be her present condition, is a species of insanity which does not appear to have been very attentively considered, either by the profession of medicine or of the law. Its approaches are most commonly so gradual as to be for some time imperceptible, and the early evidences of it are almost always exceedingly equivocal. Under the generic legal term, non compos mentis, is comprehended every species of mental derangement -which incapacitates a man from assenting to, or making a legal contract. But, for the purpose of obtaining as clear a view as may be of a subject so obscure, and without placing too much reliance upon any general definitions, *386 I shall follow what appear to be the substantial distinctions marked by external indications, and recognised by our law as manifested in idiocy, delirium, lunacy, and dotage, (e)
Idiocy is that condition in which the human creature has never had, from birth, any the 'least glimmering of reason; and is utterly destitute of all those intellectual faculties by which man, in general, is so eminently and peculiarly distinguished. It is not the condition of a deranged mind; but that of a total absence of all mind. Hence this state of fatuity can rarely or ever be mistaken by any, the most superficial, observer. The medical profession seem to regard it as a natural defect, not as a disease in itself, or as the result of any disorder. In law, it is also considered as a defect, and as a permanent and hopeless incapacity.(f)
Delirium is that state of the mind in which it acts without being directed by the power of volition, which is wholly or partially suspended. This happens most perfectly in dreams. But what is commonly called delirium, is always preceded or attended by a feverish and highly diseased state of the body. The patient in delirium is wholly unconscious of surrounding objects; or conceives them to be different from what they really are. His thoughts seem to drift about; wildering and tossing amidst distracted dreams. And his observations, when he makes any, as often happens, are wild and incoherent; or, from excess of pain, he sinks into a low muttering, or silent and death-like stupor, (g) The law contemplates this species of mental derangement as an intellectual eclipse; as a darkness occasioned by a cloud of disease passing over the mind; and which must soon terminate in health or in death.(h)
Lunacy is that condition or habit in which the mind is directed by the will, but is wholly or partially misguided, or erroneously governed by it; or it is the impairment of any one or more of the faculties of the mind, accompanied with, or inducing a defect in the comparing faculty. For, as has been observed by a great philosopher, those who either perceive but dully, or retain the ideas that come into their minds but ill, who cannot readily excite or compound them, will have little matter to think on. Those who cannot distinguish, compare, and abstract, would hardly be able to *387 understand and make use of language; or judge or reason to any tolerable degree; but only a little and imperfectly about things present and very familiar to their senses. The defect in idiots seems to proceed from want of quickness, activity, and motion in the intellectual faculties, whereby-they are deprived of reason; wheréas madmen seem to suffer by the other extreme: for they do not appear to have lost the faculty of reasoning, but having joined together some ideas very wrongly, they mistake them for truths, and they err as men do who argue right from wrong principles. For, by the violence of their imaginations, having taken their fancies for realities, they make right deductions from them. In short, madmen put wrong ideas together, and so make wrong propositions, but argue and reason right from them; but idiots make very few or no propositions, and reason scarce at all. The erroneous perception of some of the mental faculties, uncontrolled by its comparing faculty, often becomes exceedingly extravagant, and extends to the whole conduct of the individual. In such cases, lunacy is so strongly marked as to be obvious at first sight, or upon a single interview with the unhappy sufferer. The most strange, whimsical, and incongruous associations are made of thoughts and objects; matter and impertinency are mixed; and the mind is involved in the most obstinate and unaccountable mistakes. During these hallucinations, however, the perceptions seem to be, in many respects quickened, and the maniac becomes exceedingly suspicious, watchful, cunning, and adroit, (i)
*388 It very commonly happens, however, that the derangement of the mental faculties is confined to some particular idea or object of desire or aversion. The idea or object thus erroneously contemplated, is usually and not inaptly called the mad point; and hence this species of insanity has been denominated monomania. (j) In cases of this kind, which may he adduced as a ground for relief or defence in any judicial controversy, it should appear that the morbid image in the mind of the patient has been connected by him with, and has perverted his judgment in relation to those of his acts which are drawn in question, (k) And as in monomania, there are whole classes of subjects as to which the intellectual faculties of the patient may be entirely trustworthy; so, -on the other hand, even in cases of general insanity, there may he not only lucid intervals in *389 all respects, but there may also be particular points and objects as to which the mind of the maniac may be perfectly clear, consistent, and sound; as in the case of the holographic will made by a lunatic woman, whose hands, at her earnest entreaty, were untied for the purpose of permitting her to write. (l)
But this proteus disorder, in its 'milder forms, is not at all perceptible to a superficial observer, often escapes the notice of the most skilful, even .after being apprised of the existence of the malady; and it frequently happens that it cannot be detected without an examination of some time, and repeated observations. Although in law this state of the mind is held to be a course or hcibit, not a mere act, but .as having some continuance; yet it is considered as a distempered condition, occasioned by disorder or accident, from which the recovery of the patient is deemed possible and probable; and therefore he and his property are always disposed of with a view to a recovery.(m)
Dotage is’that feebleness of the mental faculties which proceeds from old age. It is a diminution or decay of that intellectual power which was once possessed. It is the slow approach of death; of that irrevocable cessation, without hurt or disease, of all the functions which once belonged to the living animal. The external functions-gradually cease; the senses waste away by degrees; and the mind is imperceptibly visited by decay. The inert and dull senses transmit the passing occurrences so imperfectly to the serisorium, that they léave none, or but a very transitory impression there. Hence long past transactions are often remembered with much more exactness- than those which have taken place recently. In the second childhood, as in the first, all the present makes but a faint and fleeting impression upon the mind. Hence the judgment in both stages, is weak, and the conduct unsteady and frivolous, (n)
*390 But a man in his dotage is evidently distinguishable from an idiot, who has no mind at all; a patient in delirium, whose mind is ungoverned and ungovernable; or a lunatic, whose mind is in ruins, broken up, and the component parts of which are at variance with each other. The old man has a mind, worn and in a state of decay, it is true, but still, so much of it as remains, is feebly governed upon the principles of its former sound condition; its conceptions are not impertinently mixed; nor is it grossly misguided in any of the feeble operations of which it is capable. Perhaps the most striking peculiarity of dotage is its imbecility of perception. The senses not supplying the mind as usual with matter for exertion, it decays for want of use; and becomes incapable of receiving any additional ideas, or of following through any unusually catinated, or long combination of thought. Hence the infant and the dotard, from imbecility of bodily functions, present that remarkable similarity in the feebleness of their minds; and easily surrender themselves to the direction of those about them, for whom they have a regard, or who may choose to exercise any authority, or influence over them. Physicians, it appears, do not regard this species of mental imbecility as being in itself a disorder, or the effect of disease.(o) But the law considers it not only as a species of insanity, from which there is no hope of recovery, but as one which always becomes worse as age advances, (p)
It has been long and well established, that a contract made by a person who is, at the time, actually non compos mentis, either as in idiocy, delirium, lunacy, or dotage, is entirely void; indeed it would seem to be difficult to conceive how such a contract should ever have been otherwise considered than as an absolute nullity. (q) But the law does not allow of an examination into the wisdom and prudence of men in disposing of their estates; for every man who is legally compos mentis, is a disposer of his property, and his will stands for a reason. The law however so far regards human infirmity, as that if a person of weak mind be imposed upon, he may be relieved; not, however, merely because of his weakness of mind, or of his old age; for, that alone furnishes no sufficient ground for vacating a *391 contract; yet, that with other circumstances, will afford a sufficient foundation for relief, (r)
What is that degree of intellectual imbecility which may be taken into the estimate as one of the component parts of a ground for relief, in those cases where the boundary between mere weakness and a condition of non compos mentis is so narrow that it may be difficult to draw the line, (s) I shall not undertake to determine, as I have not heen able to find _ it any where particularly described, (t) It must not, however, be confounded with mere ignorance. If the grantor be an ignorant and illiterate man, one who cannot read; it is necessary, that the deed should he fully and correctly read to him; for, if it is not read at all, or improperly read to him, or if it be read or explained to him improperly even by a stranger, (u) he will not be bound by it; not on the ground of weakness of mind, of of his incapacity clearly to judge of what he was about; but because his sound mind cannot be presumed to have assented to that of which it was wholly ignorant or misinformed.(v)
It has been laid down in general terms, that it is fraudulent to obtain a deed by the exercise of undue influence over a man whose mind had ceased to be a safe guide of his actions ;(x) or from a man who was of small understanding and not able to govern the lands which had descended to him.(y) A woman who could read and write, and had taught a child to read, -was held to be a person of weak understanding;(z) so repeating scraps of Latin and reading classic authors was deemed no proof of sanity; because what a person learns in his youth leaves a lasting impression, and the traces of it are never entirely worn out. Such a person, though not a lunatic, was determined to be a weak'man.(a) In another case it is said, that the man was foolish to imbecility, though not to downright idiocy. (b) A man who had entirely recovered from a long continuance of lunacy is said to have been of a diseased intellect from his birth.(c) A young man is said to have been of mean parts and easy to be imposed upon.(d) A person is spoken *392 of as being seventy-two years of age and a weak man easily to be imposed upon.(e) And again it is said that the grantor was upwards of eighty-four years of age; blind or nearly so, and altogether dependent on the kindness and assistance of others, (f) From all which it would appear, that by weakness is meant a sort of mental imbecility approaching to the condition of one who is actually non compos mentis, and analogous to childishness and dotage, (g)
_ The circumstances which, when taken in connexion with this weakness of mind, constitutes a foundation of fraud whereon to vacate a contract, are various.(h) Such as that of the deed never having been left for perusal; or its not being read; or its being-prepared by the grantee and obtruded on the grantor; or where the gift was exorbitant; or where the party'had not then the means of paying what he stipulated to pay; or where in consequence of the relation in which the parties stood towards each other, or in any way, the grantee had obtained a commanding influence, or the entire confidence of the grantor, which was used ; as in the case of a wife who had used unwarrantable means to insinuate herself into the favour of an old man, and by imposing upon his weakness, had clandestinely obtained from him a conveyance of his estate ;(i) or where the consideration was greatly inadequate; or where the weak man, had conveyed all his property, leaving himself to be fed and clothed at the pleasure of the grantee. In all these, and many other similar cases, the weakness of mind of the party, who was not altogether non compos mentis, has been taken into account wúth the other circumstances to make up that amount of imposition and fraud which was considered as a sufficient ground for relief, (j)
This plaintiff, it appears, has until the latter years of her long life enjoyed a full share of sound well regulated mental capacity. But when this suit was instituted she had advanced beyond the *393 eighty-fourth year of her age; and upon a short interview which I had with her, after the commencement of this suit, it appeared that her age was attended with at least its ordinary infirmities. Some of the most skilful of the witnesses after a short visit, which they made to her, say, that they observed in her mental powers a slower comprehension and a diminished power of associating her ideas, which is common to óld age. Other witnesses represent her mind as then .in a state of absolute dotage; in a condition of feebleness reduced much below that degree of power necessary to a sensible disposition of her property. And the defendant admits, that the plaintiff was then' so enfeebled by age and its consequent infirmities, that her mind was exposed to the exercise of very undue influence by those about her. From the very nature of this mental infirmity, it is evident, that its then existence is, in itself, proof of its' having commenced some time before. The transition from soundness of mind to delirium, or lunacy, may be very rapid or instantaneous; but dotage is a slow decay, the external signs of which do not appear until after it has been going on for some time. The proofs clearly establish the fact, that the plaintiff is now in a state of dotage. But its perceivable commencement has not been so well ascertained. Two of the witnesses speak of its having been observable so much as about eight years ago. It is certain, however, that her dotage commenced some years before the institution of this suit. The proofs, in relation to the plaintiff’s conduct, also exhibit some instances of the milder forms of lunacy. The plaintiff’s account of a hurt she had lately sustained, ascribing it to her falling in a race she ran; the particulars she related of her visit to Annapolis ; and some other circumstances, are evidences of that species of incongruous association and misguided direction of the mind so peculiarly characteristic of lunacy. Such is the sum and' substance of the testimony so far as regards the general condition of the plaintiff’s mind.
In relation to the epoch of the execution of the deed of the 15th of June 1824, the proceedings and the proofs are more distinct and particular. It is stated and admitted, that the plaintiff was subject to attacks of erysipelas, and was suffering under that disorder when the instrument of writing, which is the special subject of this controversy, was executed. From good medical authority we learn, that erysipelas is often preceded, or attended, or succeeded by delirium; that it is apt to affect the brain ; and *394 that the inflammation or oppression of the brain is known either, by delirium with -a quick pulse; or by stupor and slow respiration with a slow pulse. And that sometimes, when the delirium is not complete, a new face, and louder voice will stimulate the patient to attend for a few moments, and then he relapses. But glaring light, loud noises, and company increase the irritation and aggravate the delirium. (k)
It appears from the testimony, that the plaintiff had been attacked with the erysipelas some days before the 15th June 1824; that one of the attending physicians was informed by the family, that the disorder of the plaintiff was a periodical one, and generally came on about eight o’clock in the morning. Dr. Marsh says, that during the paroxysms, there was always a determination towards apoplexy. Dr. Griffith visited the plaintiff on the 14th of June, (he thinks in the afternoon,) she then complained a good deal of her head, but was rational. The Doctor perceived no disarray of intellect; and he thinks she was at that time sufficiently possessed of her faculties to make a contract or dispose of her property. But after the Doctor left her, and in the evening of the same day, she was delirious; or as the witnesses say, out of her head; and her mind was entirely gone; that when roused she would speak incoherently and then sleep again; . insensible to any thing that passed; that there was some company in the plaintiff’s room, who were removed lest their conversation and noise should disturb or injure her.
About sunrisemf the morning of the 15th of June; the defendant came into the chamber of the plaintiff, and with a great noise hoisted the windows, threw open the shutters, and-let into the room a strong light; which however did not arouse the plaintiflj who had lain the whole night, and then was in a state of apparent preternatural sleep; insomuch so, that she did not notice an attendant, who, after the windows had been thus noisily opened, felt her forehead and took hold of her hand. Immediately after which the defendant was left alone in the room with the plaintiff -thus abed. What passed, if any thing, while these parties were so left together in the same room, does not appear. But in a short time afterwards, Thomas D. CocJcey and John Feudal, two justices of the peace, who had, the evening before, been sent for and requested, by the defendant, to attend there on that morning, were introduced into *395 the plaiatiff’s chamber by the defendant; they found the plaintiff quite awake, and interchanged with her the usual salutations on the meeting of acquaintances. Immediately after the coming in of these justices the defendant produced the instrument of writing referred to in the proceedings as the deed of the 15th June 1824; and offered it to the plaintiff for execution. The defendant raised the plaintiff up, and assisted in seating her in bed; and then on being accommodated by a desk placed in her lap to write upon, and having her hand steadied or guided by Justice Feudal, the plaintiff signed the instrument of writing and acknowledged it as her act and deed; and these justices' took aqd certified the acknowledgment accordingly. This instrument of writing so signed by the plaintiff, which conveyed the whole of her property, was not then read to, or by her; nor does it appear, that she ever once saw it before; nor was there at that time any conversation upon the subject. No one else was then present in the room but these four persons, the two parties, and the two justices. And, after a stay of about one hour in the house, the.two justices departed.(l)
These justices (one of whom, Fendal, only it appears but once ever saw the plaintiff at any other time during the illness under which she was then suffering,) both assert, that when they took her acknowledgment of the deed, she was in a sound state of mind. But other witnesses testify, that on the morning of that day she was in rather a weaker condition than on the, evening before ; that her mind was evidently wandering; and that she was manifestly incapable of judging of the propriety or effect of any deed or other *396 matter which required consideration; and that she had been in that condition some two or three days previous. About four o’clock in the afternoon of the 15th, Dr. Marsh visited the plaintiff and found her apparently asleep, but on being once or twice called by the defendant, the plaintiff roused up, and gave him her hand. The Doctor thinks she answered intelligently to all the questions he asked her. But he declined to answer directly, and say, whether or not she was then in a sound state of mind; and says, that the questions he asked her were not of a nature for him to judge of her sanity. On the next morning, the 16th, Dr. Marsh and Dr. Griffith at nine o’clock, visited the plaintiff, and found her in an apoplectic state, entirely insensible and unable to speak or move; and requiring all the strength of one of them to straighten her arm to bleed her.(m) After being bled she continued to be perfectly comotose, or absorbed in a preternatural sleep, or stupor, until daybreak of the 17th, when she awoke; hat was still incoherent in her mind. After which she gradually recovered.
The instrument of writing, which was thus signed on the 15th of June 1824, had been prepared by Justice Feudal, as he states, for and at the request of the defendant about six months previous ; but the defendant admits, in her answer, that she had caused it to be prepared by him in 1822. During the greater part of the interval between the periods of its preparation and execution, the plaintiff had enjoyed her usual state of good health. About six months before this instrument was executed, in a conversation upon the subject of the provision which the plaintiff had promised, or intended to make for the defendant, the plaintiff declared to the defendant, that she would leave her no more than a life estate in her property. And the plaintiff often before and after made similar declarations. The defendant had always continued to reside with the plaintiff, who had latterly confided the management of her estate very much or altogether to the defendant, who had always conducted herself toward the plaintiff as a dutiful daughter ; .and the plaintiff had great confidence in the defendant.
Upon the whole then, and after the most careful investigation of this case, thus far, there appears to be no one ground upon which this deed can be permitted to stand. It was prepared at the sole instance of the defendant. It was never at any time submitted to *397 the consideration of the plaintiff, or in her possession for an instant before its execution ; and at that time, it was neither read by or to her, or explained to her in any form whatever, (n) It conveys to the defendant, in the most full and comprehensive terms, the whole and entire estate real and personal of the plaintiff, without condition or reservation of any kind whatever. It professes to have been made for value received, but was in fact signed without the least valuable consideration; and, if sustained, would leave the plaintiff utterly destitute and pennyless. At the time of the execution of this deed the plaintiff was upwards of eighty-four years of age; and was then, and had been for some time previous in a state of general dotage: and besides, was at the time suffering under an attack of erysipelas, that grievously affected her mental faculties, from which attack she could not have immediately recovered a perfectly sound state of mind, even after that bodily disease had intermitted or passed off, and which disorder must have considerably accelerated the previously commenced devastations of age.(o) This deed must therefore be annulled, as well because the plaintiff was, at the time it was executed, actually non compos mentis ; as on the ground, that it was obtained by the most gross abuse of confidence, and by a fraudulent combination ; for, as it has been truly said, fraud and deceit by him who is trusted, is most odious in law.(p)
Thus far the plaintiff will obtain all the equity she asks. But he who asks equity must do equity. The plaintiff herself seems to admit in her bill, when taken in connexion with her late husband’s will, which she exhibits as a part of it, that she stands here in some sort encumbered -with an equity due to the defendant. And the only difference between these parties as to that claim is as to its extent. The defendant claims an absolute estate in fee simple in the property of the plaintiff after her death. While, on the other hand, the plaintiff insists, that the defendant’s claim extends no further than a life estate with remainder to her lawful children, should she have any.
The bill states, that the plaintiff was seized in fee simple of a tract of land called “John Thomas’ Forestthat at an early period of her life she married John C. Owings, who made his will, *398 which is exhibited as a part of the bill, and died in February 1810; that the plaintiff had intended, by her last will, to make some sufficient provision for the defendant, the nature of which is thus described. After some specific legacies to the plaintiff’s children and grand-children, to give the defendant an estate for life in her real property, the residue of her personal estate, and a remainder in the real estate to the defendant’s children should she have any; and in the event of failure of issue lawfully begotten, then to the other children of the plaintiff to be equally divided among them. That the defendant- being wholly dissatisfied with such a provision, and insisting on an unconditional absolute estate in the whole, the plaintiff then openly avowed her determination to make no will; to die intestate, and to leave her property to pass and be distributed according to law. The defendant admits these facts; but alleges and insists, that four of her sisters- having been amply provided for by the late Thomas C: Deye their uncle, the plaintiff promised the late John C. Owings the defendant’s father, that she would give her estate to the defendant. In consequence of which, and in confident reliance upon that promise, her father made his will, in the manner he did, leaving the defendant nothing more than a mere token of his affectionate recollection. And the defendant avers, that the deed of the 15th of June 1824 was made with a view to and in fulfilment of that promise.
From the proofs it appears, that John C. Owings and the plaintiff his wife during their marriage had eight children, who survived him; and that he had a large estate consisting of real and personal property within this State and elsewhere; that his uncle the late Thomas C. Deye, was seized of a considerable real estate, which by his last will he devised to four of the daughters of his nephew John C. Owings, each of whose share contained from four hundred and fifty to six hundred acres of land, the least of which was estimated as worth about $16,000; that John C. Owings, the late husband of the plaintiff, by his will, and otherwise, gave the whole of his real and personal estate to his two sons Thomas D. Owings and John C. Owings ; except some' personalty, which he gave to his wife, and some other property, which he gave to his daughters in payment of a debt he owed them. The property he gave to his son Thomas is said to have sold for $20,000.
In his will the late John C. Owings, the father of the defendant, says — “ I give to my daughter Charlotte Deye Owings a family Bible and a spinning wheel as a token of my affection, it being my *399 desire and expectation, that her mother will provide for her, she having fully in her power to do so. Item. I give unto my four daughters Mary C. JYesbit, Charcilla Cockey Beye Owings, Penelope B. Price, and Frances Thwaites Beye Owings, one family Bible each, they having been heretofore provided for by my uncle the late Thomas Cockey Beye.”
Thus it appears to have been the intention of the testator John C. Oioings so to dispose of his property as that the provision for each of his children, noticed in his will, should' be entirely or nearly equal. That is, of his eight children, he himself provided for two; his uncle had portioned four; and a seventh he left to be provided for by her mother. Of his eighth child, Cassandra, he takes no notice in his will; she had married, disposed of herself, and was then resident at a great distance from him. It appears in proof, that the “ desire and expectation,” thus expressed by this testator,- and the exclusion of his daughter Charlotte from any share of his property, was in consequence of, and founded upon an express promise made to him by the plaintiff, (at a time when it is admitted on all hands she was in a perfectly sound state of mind,) that she would give all her property after her death to their daughter, this defendant, in fee simple; and in full confidence, that this promise so made to him for the benefit of Charlotte would be faithfully observed and kept, he made his will, and in about one month after-wards died.
' Some time after the death of John C. Owings, his son John, being sick and in a rapidly declining state of health, declared his intention to devise his estate to his sister this defendant, when his mother, the plaintiff, dissuaded him from doing so, and induced him to give it to his sister Cassandra, promising him, that if he would do so, she the plaintiff would provide for the defendant. Upon the faith of which promise he made his will, devised his estate to his sister Cassandra, and died. There is nothing said in the pleadings about this devise by John to Cassandra; or as to John’s inducement for making it. But it may be fairly inferred, that the plaintiff was actuated by a strong feeling of equity towards all her children; and knowing, that she had promised to give her estate to the defendant, she wished John’s to take another direction, and be given to Cassandra, in order to provide for her; and also to prevent the defendant from obtaining a double portion. Taken in this point of view, I have deemed it a matter which might be noticed as a corroboration of the proofs in relation *400 to the promise made by the plaintiff to her late husband for the benefit of the defendant.
There can be no doubt, that the plaintiff always admitted she had intended to give a life-estate, at least, in her property to the defendant. Much testimony has been collected in relation to what the plaintiff had said since the death of her husband, as to the manner in which she intended to provide for the defendant. But the greater part of these declarations are proved to have been made subsequently to that period of time when her mental decay had commenced; and therefore, so far as they may have been introduced as evidence of the affirmance of an equivocal or voidable promise, deserve little attention. But it is of no kind of importance to ascertain what were, at any time, the limits of the plaintiff’s intended bounty to the defendant; Because, as to that her will is the law. Therefore, all the testimony which relates to her declarations of benevolent intentions, may be at once put out of the case.
The question here is, not what the plaintiff at any time kindly intended; but whether she had' made such a promise as is alleged, and what have been her admissions and acknowledgments of that promise, if any. As to which, it appears, that when the plaintiff was called on, at a time about the commencement of her intellectual decay, to say whether she had actually made any such promise to her late husband in favour of the defendant, or not; and whether any thing was then said about her giving to the defendant any thing less than an absolute estate of inheritance? she distinctly acknowledged,That she had made such an unconditional promise; and that nothing was then said about an estate for life. And the plaintiff has since made similar acknowledgments as to the nature and extent of her promise. The circumstance, that one of her children had been cut off from any participation in the father’s property, because of her having promised to provide for such child, was calculated, from its very interesting nature, to make a strong and lasting impression, and likely to be distinctly recollected even after her mind had fallen into a great degree of decay.(q)
These acknowledgments of the promise are mainly corroborated by the circumstances of the late John C. Owings’ family at the time of his death; and the disposition which he made of his estate by his will. His other children, there spoken of, having had estates *401 of inheritance given to them by himself, or his uncle, shews what was his understanding of the plaintiff’s promise at the time it was made to him; and that in the “ desire and expectation,” expressed in his will, he alluded to a provision having the nature and extent of the others there made or spoken of, and not merely a fettered donation, or an estate for life only. -Hence, all circumstances considered, I have come to the conclusion, that the promise was made by the plaintiff, and to the extent alleged by the defendant.
To constitute a valid contract, the performance of which may be enforced either at law or in equity, it must be founded on a sufficient consideration. That is, the moving cause of the contract must be some benefit to the person called on to comply with it; or' a benefit to a stranger; or some damage or loss sustained by the party claiming the performance ; which benefit or loss has accrued or happened at the request or instance of the party of whom the claim is made.(s) Upon a mere naked pact or agreement, not founded on any such consideration, no suit, 'according to our law, can be sustained either at law or in equity. In the case under consideration, the defendant, it is shewn, did sustain a loss by reason of the promise of the plaintiff.
This promise, however, was not made by the plaintiff to the defendant; and yet it is, in general, essential to the nature of a consideration, that it should move from the party asking a performance of the contract: for if such party is a mere stranger to the consideration, having himself sustained no loss, nor conferred any benefit on the opposite party, he himself has no claim to have such contract fulfilled. But a father is under a natural obligation to provide for his children; and therefore, a promise made to him for their benefit, as in this instance, may well extend to them. As where a father was about to cut £1000 worth of timber to raise a portion for his daughter, the heir promised him, that if he would forbear from felling the timber, he, the heir, would pay the daughter £1000. The father did abstain, in consequence thereof, from cutting the timber, and died. It was held, that the contract with the father enured to the benefit of the daughter, was founded on a sufficient consideration, and that the daughter might sustain an action upon it against the heir, and recover, (t)
*402 It is now regarded as the well settled doctrine of the Court of Chancery in England, that if a person had, before his death, communicated his intention to make, or alter his will, and give a legacy, or portion of his property, to a certain individual, and the heir, or any one else, had interposed, and prevented the making or alteration of a will by a promise to pay the amount of the proposed legacy, to transfer the property, or to give any thing else in lieu of it to the individual thus intended to be benefited; that the promise so made is binding, as being made on a consideration of loss to-the individual; who may therefore enforce the specific performance of it in a court of equity. The statute of frauds has been repeatedly urged as-an objection against such promises, and the objection has always been overruled. The parent or friend of the individual intended to be benefited, being put at rest, and relying upon such promise, dies in perfect confidence that it will be fulfilled. But if the individual who has been so disappointed of an express provision by the deceased, could not have the promise enforced, his loss would be altogether irretrievable. The heir, or person making it, would be suffered to frustrate the intention of the deceased; to practise a fraud with perfect impunity; and the statute of frauds, if it were allowed to apply, would be made to operate for the protection instead of the prevention of fraud, (u)
This doctrine, which has been so long and so well established in England, has been finally and solemnly -recognised by the court of the last resort in this State. 'The case is to his effect: Charles Browne being seized of a considerable real estate in Maryland, declared his intention so to dispose of it, that if this eldest son and heir, James Browne, should inherit or succeed to the estate of Andrew Cochrane, in Scotland, then it should pass to and vest in his second son Basil Browne. Upon which James promised his father, that in the event of his obtaining Cochrane’s estate, he would convey the Maryland estate to Basil: provided his father would make no will, and permit the Maryland estate to descend to him, James, as his heir at law. Charles, the father, in consequence thereof, died intestate, and suffered the Maryland estate to descend to James ; who afterwards succeeded to the estate of Cochrane. Upon a bill filed by Basil, the promise was held to be founded on *403 a sufficient consideration, and it was decreed, that James should convey the Maryland estate to Basil accordingly, (v)
The defendant having, as appears in proof, lost, or failed to. obtain an estate of inheritance, by reason of the plaintiff’s having undertaken to give her such an estate in her property after her death, it is clear, according to the established principles of equity, that the defendant should, in some form or other, have the full benefit of that promise assured to her. The whole controversy is now, perhaps, as fully presented to this tribunal as it ever can be hereafter, by any other or different form of procedure. It would, therefore, seem to be incumbent upon the court now, finally to dispose of the whole matter, as well on behalf of the defendant as on the part of the plaintiff. To stop short with decreeing, that the deed of the 15th of June should be annulled, would be to dispose of no more than the one-half of the matter in dispute. It would be leaving the claim 'of the defendant, which has been so fully developed by the pleading and proofs, to be determined at a future day, and most probably between other parties; the defendant, if she lives, on the one hand, and the representatives of the plaintiff on the other, who may be very numerous; and the proofs, which are now strong and satisfactory, may be then very much wasted, or totally lost.
There are many cases in which this court, in order to dispose of the whole matter in controversy, grants the relief to which the plaintiff has shewn himself to be entitled .upon terms. No one is allowed to take a fraudulent advantage of the weakness or necessities of another. As in cases of sales by expectant heirs; in cases between guardian and ward; in cases of Usury, and the like. But in all such instances, when the court grants the relief prayed, it is upon the terms, that the plaintiff who asks equity shall do equity. And therefore, the fraudulent securities are allowed to stand for what is really due, or they are vacated only upon condition, that the plaintiff performs that which in equity and conscience he ought to perform, (w) Upon these principles this fraudulent conveyance of the 15th of June might be vacated only upon the condition, that the plaintiff should how, in conformity with her promise, make a settlement upon the defendant.
*404 On a proper bill to account, after a decree to account, both parties are considered as actors, and therefore, according as the balance may be shewn, there may be a decree in favour of the defendant, or in favour of the plaintiff, (x) But it is not essentially necessary, in other cases, that the decree should directly respond to the special prayer of the bill, by merely denying relief upon the case; or by granting it to the plaintiff, either conditionally or partially, or entirely as prayed. The matter in controversy being fully developed, a decree may, in several instances, be framed to meet the case disclosed, altogether apart from the relief which the plaintiff asks for himself, (y) As where a bill is filed against two or more defendants, and it appears that some of them are answerable only in the second degree, that is, as agents of a principal; in such case the principal will be first charged, and the agents only in the second degree, or upon the default of the principal ;(z) and so too, where it appears that one is principal, and the others are sureties, the court will, if called on when about to give the plaintiff the relief he seeks, go on to decree over as against the one who is principal, that in case the decree in favour of the plaintiff is satisfied by the sureties, they shall be reimbursed by their principal, (a) And where there are two or more defendants, a decree may be passed as between any two of them, when a case is made out between them by evidence arising from the pleadings and proofs between the plaintiff and defendants.(b) And also where, on a bill for a specific performance, the defendant proves an agreement different from that insisted on by the plaintiff, he may have a decree upon his answer submitting to perform the agreement; and this without a cross-bill, which whs formerly deemed necessary, (c) And it has been the practice of this court in similar cases, without a cross-bill, to decree as well in favour of the defendant, as of the plaintiff, where it appeared from the nature of the agreement or transaction between them, that each was bound to pay money or to perform some act for the benefit of the other, (d) And even a direct decree in favour of the plaintiff may, in its consequences, *405 operate as a decree binding Iris interests in like manner as if it had been passed directly against him. For it is now established, that if a bill filed by a mortgagor for redemption, is dismissed, the money not being paid at the time specified in the decree for redemption,' that operates as a foreclosure; and is equivalent to a decree for a foreclosure, (e) Or there maybe a decree against both parties, as where the contest is as to some private right of property, and it appears from the proofs, that the title. is in neither, but in the State, both parties may be perpetually enjoined from using the property to the prejudice of the public.(f)
In such cases there can be no danger of surprise, or want of opportunity to adduce proof; because the indirect, inverted, or constructive decree, is confined to that subject alone, which the parties themselves have, ’by their pleadings, spread before the court. Here the bill and answer disclose the whole matter in dispute relative to the promise of the plaintiff, as fully as it' could be done by a cross-bill. The defendant not only sets out and relies upon the promise of the plaintiff, but attempts to sustain the deed of the 15th of June, upon the ground of its being a mere fulfilment of that promise. Thus representing the promise as the original contract. This allegation of the defendant has been put in issue as a material part of the subject in controversy; and like every other part of the matter in issue, it may, without the unnecessary circuity and expense of a cross-bill, be met by such a decree as justice requires, either in favour of, or against the plaintiff, (g)
Here again, however, we are met by another obstacle, arising from the present unsound intellectual condition of the plaintiff. And that too, whether the decree in her favour be upon terms; or it be in part against her. But a change in the mental condition of a contracting party, by his becoming afterwards a lunatic, certainly ought not to release him from his liability. And it has accordingly been held, that the rights of the parties remain unchanged by such an act of God. The only difficulty is how to come at the remedy. If the legal estate is vested in trustees, a court of equity ought to decree a performance; but if it be vested in the lunatic himself, that, it was formerly held, might be an insuperable obstacle to any adequate relief here, because this court could by its ordinary powers *406 only give relief by decreeing a conveyance, which the lunatic could not be ordered to make, because of his incapacity to contract, (h)
But here, although the legal estate is vested in the plaintiff herself ; yet if the matter were left at law no relief could there be obtained against the plaintiff during her life; nor could a specific performance be obtained at any time against any one at law: therefore, from the very nature of the case, the relief necessary to meet it, can only be obtained, if at all, in a court of equity. It is laid down, that if a man by age, or disease is reduced to a state of debility of mind, which though short of lunacy, renders him unequal to the management of his affairs, the court will, in respect of his infirmities, appoint a guardian to answer for him, or to do other acts, as his interests, or the rights of others may require, (i) And it is said, that where one who could not be proved a lunatic was relieved from a deed obtained of him by fraud and imposition upon his weakness, it was further ordered, that he should not execute any future deed, but with the consent of the court, (j)
It was upon these authorities, that I passed the order of the 17th of April last. I deemed it then necessary to extend to the plaintiff the especial protection of the court; because of her age and infirmities. And if by reason of that infirmity merely, the court can in no way cause that to be done, which when in a sound state of mind she had bound herself to do, the most manifest injustice might ensue; and that too not from any substantial, but merely because of a technical or formal objection. If, as has been said, this court can declare, that she shall not hereafter execute any deed without its consent; the converse of the proposition seems necessarily to follow — that this court can by its consent or decree direct a conveyance to be made by her to the defendant according to the promise by which she is bound.
There can be no doubt, that a specific execution of this promise would be decreed against the legal representatives of the plaintiff *407 if she were dead. (k) And it is equally clear, that if she were now in her sound mind she herself might comply with this promise either by a last will devising her property to the defendant; or by a deed to take effect after her death.(l) But she is not now, nor is she ever likely again to be in a mental' condition, understandingly of herself, to execute any such- instrument as can pass any right in her property. It has, however, been expressly provided, that persons non compos mentis seized of possessed of any lands bound by an agreement to convey, made by some person having a right to make such agreement, and therefore liable to a decree for conveyance on a suit for specific performance, shall convey and assure such lands in such manner as the Court of Chancery shall direct ;(m) and that in all cases where a decree shall be made for a conveyance, and the party shall neglect to comply therewith, such decree shall be considered to have the same operation as if the conveyance had been executed conformably to such decree, (n)
Upon the whole, I am, therefore, of opinion, that there is now no other course left but to appoint a guardian for the plaintiff, who shall be directed to execute, in her name, to the defendant such a deed as shall be deemed a sufficient specific performance of her promise, to take effect after her death.
Whereupon it is decreed, that the said defendant, Charlotte C. D. Owings, be and she is hereby directed and required forthwith to bring into this court the original instrument of writing in the proceedings mentioned, purporting to be a deed made by the said plaintiff, Colegate D. Owings, unto the said defendant, Charlotte C. D. Owings, on the 15th-day of June 1824, to be cancelled and annulled; and the same is hereby declared to be null and void; and the record which hath been made of the said instrument of writing among the land records of Baltimore County Court shall be and the same is hereby declared to be utterly void and of no effect whatever, because of the said instrument of writing having been obtained from the said plaintiff Colegate D. Owings by fraud and at a time when she was non compos mentis.
And it is further decreed, that William Gwynn of the city of Baltimore be and he is hereby appointed' guardian of the said plaintiff Colegate D. Owings for the purpose, and with full power *408 and authority to make, execute, acknowledge, and deliver according to law a deed of conveyance as hereinafter described, in the name and behalf of the said plaintiff Colegate B. Owings, unto the said Charlotte C. B. Owings.
And it is further decreed, that the. said plaintiff Colegate B. Owings forthwith execute, acknowledge, and deliver, according to law, by her said guardian William Gwynn, unto the said defendant Charlotte C. B. Owings a good and sufficient deed, thereby conveying all the real estate of the said plaintiff Colegate B. Owings in the proceedings mentioned, called “ John & Thomas’ Forest,” unto the said defendant Charlotte C. B. 'Owings, her heirs and assigns for ever; and also by the same deed conveying, transferring, and making over unto the said defendant Charlotte C. B. Owings, her executors, administrators and assigns, all the personal property of the said plaintiff Colegate B. Owings, which shall be and remain at the time of her death. And in the said deed of conveyance it shall be expressly stipulated and declared, that the same shall in no respect take effect or have any force or operation whatever during the lifetime of -the said plaintiff Colegate B. Owings ; but the same shall take effect and be in full force and operation upon and immediately after the death of the said plaintiff Colegate B. Owings. And it shall be further expressly stipulated and declared in the said deed of conveyance, that if the said defendant Charlotte C. B. Owings shall die without leaving any lawful issue, in the lifetime, and before the death of the said plaintiff Colegate B. Owings, then and in that case the said deed of conveyance and every part thereof shall -be utterly null and void to all intents and purposes whatever.
And it is further decreed, that the said defendant Charlotte C. B. Owings pay unto the said plaintiff Colegate B. Owings her full costs expended in this suit, to be taxed by the register.
Soon after the passing of this decree the plaintiff died, and yet an appeal was prayed in her behalf, and the case taken to the Court of Appeals. After which, by a petition signed by one of her solicitors the court was asked to pass an order directing the defendant to pay the costs as taxed by the register.
8th JYovemher, 1828. — Bland, Chancellor. — It may not be amiss here to observe, by the way, that in England an appeal from a decree in chancery may be had at any time within five years, with *409 a saving in favour of persons non compos mentis.(o) Here it is declared, that all appeals shall be made and entered within nine months from the time of making the decision, and not afterwards; unless it be alleged on oath, that such decree was obtained by fraud or through mistake ;(p) but there.is no saving in favour of persons non compos mentis.
Where a decree has been passed, as in this instance, affecting as well the real as the personal estate of the parties, and the suit abates by the death of either of them, as the realty passes to the heirs and'the personalty to the administrator or executor of the deceased, in order to embrace the whole subject of the decree, it should be revived by of against both the heirs and personal representatives of the deceased party. But such a comprehensive revival of the suit is not in all cases indispensably necessary, as each class of the representatives of the deceased may revive and prosecute the suit to the extent of their respective interests, and no further.(q) It is said, that in England a suit cannot be revived merely to recover costs not taxed: this however has been regarded there as a very odd rule;(r) and having met with no instance of its having been acted upon by this court, I feel no hesitation in rejecting a rule which has been so often condemned, and which appears to be now reluctantly tolerated by the tribunal in which it originated. Be that however as it may, in this case the costs, it is alleged, have been taxed, and therefore the amount of them, as a liquidated decreed debt, on the death of the plaintiff passed to her personal representative. Consequently, in order to recover that debt this decree may well be revived by her executor or administrator alone; but no attempt appears to have been as' yet made so to revive it.
Whereupon it is ordered, that the said petition be and the same is hereby dismissed with costs.
After which the case having been brought before the Court of Appeals, the appeal was dismissed. Owings v. Owings, 3 G. & J. 1.

 Wartnaby v. Wartnaby, Jac. Rep. 377.

 1 Coll. Idiots, 80; Holman v. Holman, 3 Desau. 210.

 Leving v. Caverly, Prec. Cha. 229; Wall’s Case, cited 3 Atk. 173; Ridgeway v. Darwin, 8 Ves. 66; Ex parte Cranmer, 12 Ves. 446; In re Holmes, 4 Russ. 182; 2 Mad. Chan. 732.

 Donegal’s Case, 2 Ves. 408; Wartnaby v. Wartnaby, Jac. Rep. 377; Whitehorn v. Hines, 1 Mun. 557; 1 Coll. Idiots, 65, 67.

 1 Mont. Dig. 39.

 Chambers v. Donaldson, 9 East, 471; Horner v. Marshall, 5 Mun. 466.
Rothwell v. Boushell. — In this case the bill stated, that John Boushell the defendant was deranged and incapable of managing his affairs, and prayed, that a guardian ad litem, might be appointed to answer for him, &e. Afterwards the plaintiff by petition stated, that a writ de lunático inquirendo had, some time since, issued, upon which it had been found and returned, that Boushell was a lunatic, and that a trustee had been appointed, who had failed to give bond as required; whereupon she prayed, that a guardian ad litem might be appointed.
13th February, 1819. — Kilty, Chancellor. — On considering the above petition, and finding on examination of the proceedings, that a bond has not been filed; and, that therefore there is not, in effect, any trustee capable of acting, it is thought proper, and within the powers of the court, to appoint a guardian as prayed. It is therefore ordered, that Thomas W. Vcasy be and he is hereby appointed guardian for the purpose of answering for the said John Boushell to the bill of complaint of Ann Roth-well in the petition mentioned.

 Ridgeway v. Darwin, 8 Ves. 67; Ex parte Tomlinson, 1 Ves. & Bea. 59; Shelf. Lun. 62, 399.

 Beverley’s Case, 4 Co. 123.

 Beverley’s Case, 4 Co. 123.

 2 Blac. Com. 291; Thompson v. Leach, 3 Mod. 301; 1 Ld. Raym. 313; 2 Stra. 1104.

 1 Coll. Idiots, 406; Copp. Med. Jur. 877.

 1 Fonb. 48.

 F. N. B. 466; 1 Pow. Cont. 19.

 1 Lond. Jurist, 340.

 Turner v. Meyers, 1 Hagg. Con. Rep. 414.

 Webster v. Woodward, 3 Day, 90; Rice v. Peet, 15 John, 503; Horner v. Marshall, 5 Mun. 466.

g) 1 Fonb. 66.

 Dr. Rush, in his observations on the diseases of the mind, has frequent recurrence to the poets for illustrations of the nature of madness; because, as he says, they view the human mind in all its operations, whether natural or morbid, with a *379 microscopic eye; and hence many things arrest their attention, which escape the notice of physicians. — (Rush on the Mind, 158.) Shakspeare has been frequently referred to by writers on the subject of mental disorder. — (Conolly Ind. Inst. 319; Coop. Med. Jur. 291; 1 Paris and Fonb. 316, note.) Justinian quotes a passage from Homer to illustrate the nature of a donation mortis causa, (lib. 2, tit. 7, s. 1,) and Lord Coke allows, that to cite verses standeth well with the gravitie of our lawyers. (Co. Litt. 237.) I shall therefore feel myself justified in placing among the references some extracts from the poets, by way of illustration and in support of what I have said, in the text:
-“Poor Ophelia,
Divided from herself and her fair judgment,
Without the which, we are pictures, or mere beasts.” Hamlet, act 4, s. 5.
“If Hamlet from himself be ta’en away,
And, when he’s not himself does wrong Laertes,
Then Hamlet does it not, Hamlet denies it.
Who does it then? His madness.” Hamlet, act 5, s. 2.
By the statute of 33 Hen. 8, c. 20, a person who had, while sane, committed high treason, and after became mad, might be tried in his absence, without making his personal appearance, &c. From which it may be inferred, that by a legal appearance at the trial, in criminal cases, is meant the actual presence of the mind as well as the body ; thus recognising the position, that in a state of Insanity the mind has left the body, and cannot be brought before the court with it. — 4 Blac. Com. 25.

 Beverley’s Case, 4 Co. 124.

 3 Bac. Abr. 541.

 Beverley’s Case, 4 Co. 127.

 1 Coll. Idiots, 67; Rebecca Owings’ Case, ante, 290.

 Shelf. Lun. 53.

 1 Pow. Cont. 20.

 The following observations of Messrs. Paris and Fonblanque, in their excellent work on Medical Jurisprudence, are”well worthy of attention : “ There are (say they) several objects, for the accomplishment of which persons are induced to simulate the existence of disease — such as, for obtaining military exemptions and discharges; or certain civil disqualifications; for the purpose of deriving parochial relief, or pecuniary assistance from benefit societies; or the comfortable shelter and retreat of an hospital; for exciting compassion and obtaining alms; for creating public interest and curiosity; for procuring a release from confinement or exemption from punishment; and, lastly, for the dishonest intention of recovering unjust compensation from some person selected for accusation, as the author of the pretended calamity.”
“The diseases which have been selected for the accomplishment of any of the purposes above enumerated are extremely numerous, although there are some few which may be said to be more generally preferred on such occasions. In general, *383 tlie medical inquirer will not have much difficulty in detecting such impostors; although there are cases where the investigation becomes a subject of extreme delicacy and importance, as in those persons reporting themselves sick and unfit for military service, or malingerers, as they axe technically called.”
"Insanity has in all ages been feigned for the accomplishment of particular objects; we read of its having been thus simulated by David, Ulysses, and Lucius Brutus. In general, the detection of such an imposition will not be difficult; the feigned maniac never willingly looks his examiner in the face, and if his eyes can be fixed, the change in his countenance, on being accused, will be strongly indicative of his real state of mind. It is, moreover, very difficult to imitate the habits of a lunatic for any length of time, and to forego sleep. An insane person generally sleeps but little, and talks much during the night; but the pretender, if he thinks he is not watched, will sleep,' and only act his part when he believes his conduct to be observed.” — 1 Par. & Fonb. 335, 359; 3 ibid. 137; 1 Hale, P. C. 33, 35; 1 Hawk. P. C. 2; 3 Inst. 6; 4 Co. 124; Coop. Med. Jur. 266, 322; Rush on the Mind, 18, 216; 1 Sam. 21, v. 13; Con. Insa. 455; Shelf. Lun. 69.
It appears from the circumstances related by Messrs. Paris and_ Eonblanque, that during the wars arising out of the French Devolution, the French and English surgeons became exceedingly skilful in detecting recruits in their attempts to escape from service in the army or navy by feigned diseases. But in all ages, under arbitrary or corrupt governments, it has been common to endeavour to defeat oppression by fraud; and where that has failed, or could not be successfully practised, there have been frequent instances, in which the individual has voluntarily maimed and disabled himself from being made an instrument in the hands of his oppressor.— Gibbon, D. & F. chap. 17; Co. Litt. 127; 2 Diver. Pur. 21. But no instance is mentioned by Messrs. Paris and Fonblanque, nor have I any where met with any allusion to a case where a party feigned insanity as a means of evading the obligation of his contract.

 Attorney General v. Parnther, 3 Bro. C. C. 441.

 Sherwood v. Sanderson, 19 Ves. 286; 1 Pari. & Fonb. 315; Shelf. Lun. 70.

 1 Pow. Cont. 22.

 Turner v. Meyers, 1 Hagg. Cons. Rep. 414.

 Conolly Ind. Ins. 62.

 1 Par. & Fonb. 307; Rush on the Mind, 234; Shelf. Lun. intro, s. 2.

 1 Par. & Fonb. 289, 308; Rush on the Mind, 292; Co. Litt. 246; 1 Hawk. P. C. 2, note; Donegal’s case, 2 Ves. 408.

 2 Zoonomia, C. 2, 1, 7; Rees’ Cyclo. ver. Delirium; Rush on the Mind, 9, 298; 1 Par. & Fonb. 300.

 1 Coll. Idiots, 7, 405; 1 Fonb. 68; Shelf. Lun. 43; Brogden v. Brown, 2 Add. Eccl. Rep. 441.

 1 Zoonomia, sec. 34, 2, 1; 2 ibid. Cla. 3, 1, 2; Rees’ Cyclo. ver. Mental Derangement; Locke Hum. Und. b. 2, c. 11, s. 12 & 13; Con. Ind. Insanity, 114, 300; 1 Coll. Id. 8, 36; 1 Par. & Fonb. 302, 311, 318; Rush Mind, 72, 133, 14, 257; Shelf. Lun. cha. 3.
“ Oh matter and impertinency mixt!
Reason in madness!” Lear, act 4, s. 6.
“ My pulse, as yours, doth temperately keep time,
And makes as healthful music: It is not madness,
That I have utter’d: bring me to the test,
And I the matter will reword; which madness
Would gambol from.” Hamlet, act 3, s. 4.
Sir Henry Halford, a celebrated English physician, relates an instance in which this test, appealed to by Hamlet, was applied to a patient of his, who desired to make his will. The sick man was requested to give directions how his will should be made, and it was accordingly drawn, read to, and signed by him; but being suspected to be of unsound mind, after a short interval, he was requested to repeat the directions he had given, “ to reword the matter,” but' in endeavouring to do so, his mind gambolled from it, and wandered so materially from his first directions, that he was *388 held to be non compos mentis, and the will was therefore set aside. — 5 Quar. Jur. Scie. 242.
A change came o’er the spirit of my dream.
The lady of his love; — Oh! she was changed
As by the sickness of the soul; her mind
Had wander’d from its dwelling, and her eyes
They had not their own lustre, but the look
Which is not of the earth; she was become
The queen of a fantastic realm; her thoughts
Were combinations of disjointed things;
And forms impalpable and unperceived
Of others’ sight, familiar were to hers.
And this the world calls phrenzy; but the wise
Have a far deeper madness, and the glance
Of melancholy is a fearful gift;
What is it but the telescope of truth 'l
Which strips the distance of its phantasies,
And brings life near in utter nakedness,
Making the cold reality too real! Byron’s Dream.

 Such phantoms pride, in solitary scenes,
Or fear, or delicate self-love, creates.
From other cares absolv’d, the busy mind
Finds in yourself a theme to pore upon;
It finds you miserable, or makes you so.
For while yourself you anxiously explore,
Timorous self-love, with sick’ning fancy’s aid,
Presents the danger that you dread the most,
And ever galls you in your tender part.
Hence, some for love, and some for jealousy,
For grim religion some, and some for pride,
Have lost their reason; some for fear of want,
Want all their lives; and others every day,
For fear of dying, suffer worse .than death.
Dr. Armstrong on Healthy book 4.

 White v. Wilson, 13 Ves. 88; Bootle v. Blundell, 19 Ves. 508; Dew v. Clark, 1 Addams' Eccl. Rep. 279, and 3 Addams' Eccl. Rep. 79; Shelf. Lun. intro. 54 & 293; Conolly Ind. Insanity, 383, 446.

 Cartwright v. Cartwright, 1 Phill. 90.

 1 Coll. Id. 33; Beverley’s case, 4 Co. 124; Donegal’s case, 2 Ves. 408; Attorney General v. Parnther, 3 Bro. Ch. Ca. 441; Fitzgerald, a lunatic, 2 Scho. & Lefr. 437; Shelf. Lun. 36.

 “ The soul in all hath one intelligence;
Though too much moisture in an infant’s brain,
And too much dryness in an old man’s sense,
Cannot the prints of outward things retain :
Then doth the soul want work, and idle sit;
And this we childishness and dotage-call. Davies.
Or, as has been said, it is that decline of all the powers of the man, when
Nature, as it grows again towards earth
Is fashion’d for the journey, dull, and heavy. Cowper.
Shakspeare’s As You Like It, act 2, s. 7, and second part of Henry 4th, act 1, s. 2.

 Rees’ Cyclo. ver. Death; 1 Par. & Fonb. 308; Rush on the Mind, 61, 292, 294; Conolly Ind. Insanity, ch. 8 & page 440, 443.

 Leving v. Caverly, Prec. Chan. 229; Ridgeway v. Darwin, 8 Ves. 66; Ex parte Cranmer, 12 Ves. 446; Gibson v. Jeyes, 6 Ves. 275.

 Thompson v. Leach, 1 Ld. Raymond, 313; 3 Mod. 301.

 Osmond v. Fitzroy, 3 P. Will. 130; Willis v. Jernegan, 2 Atk. 251; Chesterfield v. Janssen, 2 Ves. 156; Lewis v. Pead, 1 Ves. jun. 19; 1 Fonb. 66.

 Bennet v. Vade, 2 Atk. 325.

 Ball v. Mannin, Shelf. Lun. 258.

 Thoroughgood’s Case, 2 Co. 9.

 Henry Pigot’s Case, 11 Co. 27; Hatch v. Hatch, 9 Ves. 295.

 Harding v. Handy, 11 Wheat. 125; Chesterfield v. Janssen, 2 Ves. 156.

 Twyne’s Case, 3 Co. 83.

 White v. Small, 2 Chan. Ca. 103.

 Bennet v. Vade, 2 Atk. 325.

 Bunch v. Hurst, 3 Desau. 292.

 Wright v. Proud, 13 Ves. 138.

 Portengton v. Eglington, 2 Vern. 189.

 Clarkson v. Hanway, 2 P. Will. 204.

 Griffith v. Robins, 3 Mad. 191.

 Kaimes’ Pri. Eg. b. 1, p. 1, c. 1, s. 3 & c. 2; Bates v. Graves, 2 Ves. jun. 289.

 Shelf. Lun. 265.

 Hervey v. Hervey, 1 Atk. 564; Mountain v. Bennet, 1 Cox. 353; Nantes v. Corrock, 9 Ves. 183.

 White v. Small, 2 Chan. Ca. 103; Portengton v. Eglington, 2 Vern. 189; Clarkson v. Hanway, 2 P. Will. 204; Donegal’s Case, 2 Ves. 408; Bridgman v. Green, 2 Ves. 627; Bennet v. Vade, 2 Atk. 324; Norton v. Relly, 2 Eden, 286; Wright v. Proud, 13 Ves. 136; Huguenin v. Basely, 14 Ves. 273; Harvey v. Pecks, 1 Mun. 518; Rutherford v. Ruff, 4 Desau. 350; Rowland v. Sullivan, 4 Desau. 518; Brogden v. Walker, 2 H. & J. 285; Gibson v. Jeyes, 6 Ves. 275.

 2 Zoonomia, Cl. 2, 1, 3, 2; Rees’ Cyclo, ver. Delirium.

 I have shewn in a former case, (H. K. Chase’s case, ante, 206) that a private acknowledgment of a deed of conveyance by a feme covert was introduced here as a substitute for a fine, and that such an acknowledgment was held to he as binding upon her, although not altogether as effectual against third persons, as a fine. A person non compos mentis cannot levy a .fine, or malee a conveyance of his properly in that mode, because the judges will not receive the acknowledgment of an insane p’érson; but if a judge does receive the acknowledgment of a fine from the most monstrous and visible idiot, it will be, held to be final and conclusive against him; because, as a judicial record, it cannot be questioned; — (Mansfield’s Case, 12 Co. 124, and 10 Co. 42;) yet a fine is said to be nothing more than a common conveyance. This pernicious incongruity between a conveyance by deed, and by fine in England, it is said, is about to be removed by a statute abolishing fines and recoveries, and substituting deeds of conveyance, which are to have the same effect without being considered as conclusive judicial records. — (Shelf. Lun. & Idiots, 248, note.) But in Maryland, the acknowledgment of a deed before justices of the peace, although in some particulars treated as the substitute of a fine, has never been considered, like a fine, as a judicial record, and to that extent conclusively binding upon the party. — (Lewis’ Lessee v. Waters, 3 H. & McH. 430.)

 “A very apoplexy, lethargy, mulled, deaf, sleepy, insensible.” — Coriolanus, act 4, s. 5.

 Thoroughgood’s Case, 2 Co. 9.

 Attorney General v. Parnther, 3 Bro. C. C. 443; 1 London Jurist, 340; Sergeson v. Sealey, 2 Atk. 413.

 Fermor’s Case, 3 Co. 79.

 Bennet v. Vade, 2 Atk. 325.

 Bunn v. Guy, 4 East, 194; Violett v. Patton, 5 Cran. 150.

 Dutton v. Poole, 1 Vent. 318; Martyn v. Hind, Cowp. 443.

 Chamberlaine v. Chamberlaine, 2 Freem. 34; Oldham v. Litchford, 2 Freem. 284; Thynn v. Thynn, 1 Vern. 296; Drakeford v. Wilks, 3 Atk. 539; Reech v. Kennegal, 1 Ves. 124; Dixon v. Olmius, 1 Cox. 414; Stickland v. Aldridge, 9 Ves. 519; Mestaer v. Gillespie, 11 Ves. 638; Chamberlaine v. Agar, 2 Ves. & Bea. 259.

 Browne v. Browne, 1 H. & J. 430.

 Twisleton v. Griffith, 1 P. Will. 310; Hylton v. Hylton, 2 Ves. 548; Nesbit v. Nesbit, 2 Cox. 183; Wharton v. May, 5 Ves. 27.

 Done’s case, 1 P. Will. 263; Anonymous, 3 Atk. 691; Horwood v. Schmedes, 12 Ves. 316; Bodkin v. Clancy, 1 Ball & Bea. 217; Davis v. Walsh, 2 H. & J. 329; 1825, ch. 158.

 Johnson v. Johnson, 1 Mun. 554, note.

 The Charitable Corporation v. Sutton, 9 Mod. 356; 2 Atk. 406.

 Walker v. Preswick, 2 Ves. 622; Taylor v. Ficklin, 5 Mun. 25; McNiel v. Baird, 6 Mun. 316.

 Chamley v. Dunsany, 2 Scho. & Lefr. 709, 718; Conry v. Caulfield, 2 Ball & Bea. 255.

 Fife v. Clayton, 13 Ves. 546; Higginson v. Clowes, 15 Ves. 525.

 Dorsey v. Campbell, ante, 356.

 Stuart v. Worrall, 1 Bro. C. C. 581; The Bishop of Winchester v. Paine, 11 Ves. 199.

 Penn v. Ld. Baltimore, 1 Ves. 454; Barclay v. Russell, 3 Ves. 436; Rex v. Leigh, 4 Burr. 2146.

 Harding v. Handy, 11 Wheat. 120; Stewart v. Mechanics and Farmers Bank, 19 John. 505.

 Owen v. Davies, 1 Ves. 82; Pegge v. Skynner, 1 Cox. 23; Hall v. Warren, 9 Ves. 611; Shelf. Lun. 429.

 Leving v. Caverly, Prec. Chan. 229; Sheldon v. Aland, 3 P. Will. 111, note; Bird v. Lefevre, 4 Bro. C. C. 100; Wilson v. Grace, 14 Ves. 172; Attorney General v. Waddington, 1 Mad. Rep. 321; Howlett v. Wildraham, 5 Mad. 423; Wartnaby v. Wartnaby, 1 Jac. Rep. 377; Ex parte Clarke, 2 Russ. 575; Chambers v. Donaldson, 9 East, 471; Whitehorn v. Hines, 1 Mun. 557; Horner v. Marshall, 5 Mun. 466; 1 Fonb. 64; Mitf. Plea. 103; Prac. Reg. 71.

 Lord Donegal’s Case, 2 Ves. 408.

 Goilmere v. Battison, 1 Vern. 48.

 Drakeford v. Wilks, 3 Atk. 540.

 1773, ch. 7, s. 1; 4 Geo. 2, c. 10; Kilt. Rep. 249; Bullock v. Bullock, 1 Jac. & Wal. 583.

 1785, ch. 72, s. 13; 1826, ch. 159.

 Shelf. Lun. 424.

 1826, ch. 200, s. 14.

 Ferrers v. Cherry, 1 Eq. Ca. Abr. 4.

 2 Mont. Dig. 524.